**UNITED STATES SHIPPING BOARD MERCHANT FLEET CORPORATION, to Use of UNITED STATES, v. ÆTNA CASUALTY & SURETY CO.**

No. 6960.

United States Court of Appeals for the District of Columbia.

Argued Feb. 10, 1938.

Decided April 18, 1938.

Leslie C. Garnett, U. S. Atty., and Keith Carlin, both of Washington, D. C., for appellant.

Challen B. Ellis and Kahl K. Spriggs, both of Washington, D. C., and Charles F. Quantrell, of New York City, for appellee.

Before GRONER, Chief Justice, and STEPHENS and EDGERTON, Associate Justices.

GRONER, C. J.

The United States Shipping Board[1] brought this action in the court below against the Ætna Casualty & Surety Company upon a bond dated January 27, 1920. Sigsbee Humphrey & Company, Inc. (hereinafter referred to as Sigsbee), was the principal obligor; the Ætna Company the surety.

The case was tried without a jury. The trial judge made certain findings of fact and conclusions of law, as the result of which he gave judgment for the surety.

The bond contains these recitals and conditions:

"Whereas, the United States Shipping Board Emergency Fleet Corporation has entered into an agreement with Sigsbee Humphrey & Company for the operating and/or managing of certain vessels heretofore or hereafter assigned to said Sigsbee Humphrey & Company, as Manager and/or Operators; and

"Whereas, the United States Shipping Board Emergency Fleet Corporation required Sigsbee Humphrey & Company to furnish a bond to save the said Corporation harmless against such pecuniary loss as the Corporation shall sustain by any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, or willful misapplication of any moneys or funds that may come into the possession or control of Sigsbee Humphrey & Company, during the life and by reason of the aforesaid agreement, and to properly account for, receive, and disburse said funds, including the prompt payment to the said Fleet Corporation, of the amounts required by the terms of the aforesaid agreement.

"Now, therefore, the condition of this obligation is such that if the above bounden Sigsbee Humphrey & Company shall well and truly save the said Corporation harmless against such pecuniary loss as the Corporation shall sustain by any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or willful misapplication of any moneys or funds that may come into the possession or control of Sigsbee Humphrey & Company during the life and by reason of the aforesaid agreement, and shall properly account for, receive, and disburse said funds, including the prompt payment to the said Fleet Corporation of the amounts required by the terms of the aforesaid agreement, and at the expiration or earlier termination of its position, shall faithfully account for and turn over to the said United States Shipping Board Emergency Fleet Corporation, any moneys, property, or other funds for which it may be accountable, then this obligation shall be void, else to remain in full force and effect.

"This bond is given subject to the following conditions:

"First. Upon the discovery by the Corporation of any evidence of the loss forming the basis of a claim hereunder the Corporation shall give to the Surety, at its Home Office, immediate written notice thereof, with all available facts, and in any event within thirty days after such discovery, and shall afford the Surety every reasonable facility for investigating the same. Payment of any such loss shall be made by the Surety promptly, after receipt from the Corporation of satisfactory statement thereof. Upon the payment of a loss the Surety shall be subrogated to all of the rights of the Corporation with respect thereto; and the Corporation will execute any and all papers reasonably required by the Surety to effectuate that purpose."

The declaration charges that the Board and Sigsbee prior to the 27th of January, 1920, entered into written agreements for the operation and management by Sigsbee of certain vessels turned over and assigned to it by the Board. The agreements were the standard form contracts adopted by the Board and known as M–2, O–2, MO–3, and MO–4. These agreements authorized Sigsbee to perform all the customary duties

---

[1] United States Shipping Board Merchant Fleet Corporation.

of managing and operating the vessels, including loading and discharging of cargoes, solicitation of freight, collection of moneys arising out of the operation of the vessels, including freight money, and the disbursement of customary operating expenses. The agreements required Sigsbee to deposit all moneys collected on behalf of the operation in a national bank in the name of the Board, "which moneys shall be the property of The Corporation," but subject to check by Sigsbee and also by the Board. Sigsbee was required not to mingle the moneys from operation with its own moneys, but to make from the trust deposit all disbursements authorized to be made for the account of the operation of the ships and to render a full account to the Board of all moneys received. All the agreements provided that Sigsbee should furnish a bond for the faithful discharge of its duties in an amount satisfactory to the Board.

The declaration then alleges: "That said Agent [Sigsbee] did not faithfully or properly perform its obligations as Agent for the aforesaid vessels under the said 'M–2,' 'O–2,' 'MO–3,' and 'MO–4' agreements, but on the contrary wholly neglected to discharge such obligations or perform such duties during the period of said management and operation of such vessels, and during the life of said bond, in that said Agent came into possession and control of large sums of money belonging to the plaintiff, to the use of the United States of America, arising out of the operation and management of said vessels, for all of which the said Agent was liable to account to the plaintiff under the terms of said agreements. Said Agent committed large numbers of defaults under the terms and obligations of said agreements, in that said Agent did not account for said moneys to the plaintiff or to anyone else on behalf of the plaintiff, it did not disburse the said moneys solely for the operation, management, and business of said vessels, did not faithfully account for and turn over to the plaintiff or to the United States of America the moneys and other properties for which the said Agent was accountable and has taken credit for items for which it should be charged; did wrongfully and willfully withdraw from said moneys and funds fees, commissions and expenses to which said Agent and its subagents were not entitled; did wrongfully and willfully represent facts, known to said Agent to be false, and did conceal from the plaintiff material facts covering the handling of the said moneys, all for the purpose of securing and did thereby secure from the plaintiff advances of money and funds belonging to the plaintiff, for the purpose of carrying out the management and operation of said vessels, and for the purpose of paying fees and commissions to said Agent, to which the said Agent was not entitled; and said Agent has misapplied and wrongfully and fraudulently appropriated funds belonging to the plaintiff to the use of the United States of America, for which said Agent was accountable under said operating agreements and has failed to account to the plaintiff or to the United States of America for such funds." Because of these things, the Board brought its action against the surety for the sum of $170,549.79, with interest from the 1st day of January, 1922.

The declaration was filed October 22, 1931. The defendant's pleas were filed February 23, 1932. The defaults for which recovery is sought were alleged to have been committed during 1920 and early in 1921. The operating agreement between Sigsbee and the Board terminated either in September or December, 1921, and the first notification given by the Board to the surety of the discovery of any evidence of loss forming the basis of any claim under the bond was on April 3, 1928.

At the trial the parties agreed to submit to the court without a jury two questions: (1) Whether compliance with the provisions contained in the bond, requiring the Shipping Board to notify the surety upon the discovery of evidence of loss forming the basis of a claim thereunder, was a condition precedent, and (2) if so, whether the Shipping Board had complied therewith.

After finding the facts with regard to those questions, the court held: "I think that the requirement of notice contained in the bond is a condition precedent of liability; that the loss sustained was of the character such that notice of loss was required; that notice was not given within the time and in the manner required by the bond and that there was no waiver by the defendant of the notice required by the bond." The court thereafter entered an order as follows: "This cause having been heretofore duly argued and submitted to the Court, the Court this day [December 29, 1936] finds for the defendant."

This appeal challenges the conclusions of the court on the two questions submitted and the judgment entered accordingly.

We think the conclusions reached by the trial court are in all respects correct. The

bond limits recovery thereunder to any moneys or funds coming into the possession or control of Sigsbee during the life of the agreement, and the surety undertakes to indemnify the Board for such loss arising from, and only from—

"(a) any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or willful misapplication of those moneys; or

"(b) any failure to account for, receive and disburse those moneys, including the prompt payment to the Shipping Board of the amounts required by the terms of the aforesaid agreement; or

"(c) any failure by the agent, at the expiration or earlier termination of the agency, to faithfully account for and turn over these moneys or their substitute to the Shipping Board."

Notwithstanding this the Board insists that the bond is a *performance bond* and not a fidelity bond; that the contract and the bond should be read together, and so read, construed as an absolute guaranty of indemnity, maturing only upon a final audit and accounting and a demand thereon. In these circumstances, the Board says notice of irregularities, etc., is not required. In other words, that the declaration states a good cause of action under the accounting provisions of the bond—if the notice requirements be confined to the fidelity provisions of the bond alone. As another ground, the Board says that even if it should be held that notice is required of the default within the time limit of the bond, the requirement is not a condition precedent but a covenant, requiring the deduction of loss only to the extent that the surety may show damages because of failure to give the notice. We think there is no basis to either of these contentions, and that to sustain them would be to ignore the plain terms of the bond.

The condition of the bond was that Sigsbee should honestly account to the Board for all funds coming into its hands. The declaration alleges that the loss occurred because Sigsbee wrongfully and fraudulently appropriated such moneys to its own use. That is to say, the event insured against happened. But in such case, the bond conditioned liability upon written notice to the home office of the surety within thirty days after the discovery of any evidence which might form the basis of a claim. The limits of the case, therefore, are within that narrow boundary, and the single question for decision is: Was there at any time prior to 1928 any evidence of misappropriation of funds within the knowledge of the Board and, if there was, did the Board give notice to the surety within the thirty days period? If there was such evidence and if there was failure to notify the surety, the action must fail. The rule in such a case was stated by the Supreme Court in Imperial Fire Ins. Co. v. Coos County, 151 U.S. 452, 462, 14 S.Ct. 379, 381, 38 L.Ed. 231, as follows: "Contracts of insurance are contracts of indemnity upon the terms and conditions specified in the policy or policies embodying the agreement of the parties. For a comparatively small consideration the insurer undertakes to guaranty the insured against loss or damage, upon the terms and conditions agreed upon, and upon no other, and, when called upon to pay in case of loss, the insurer, therefore, may justly insist upon the fulfillment of these terms. If the insured cannot bring himself within the conditions of the policy, he is not entitled to recover for the loss. The terms of the policy constitute the measure of the insurer's liability, and, in order to recover, the assured must show himself within those terms; and, if it appears that the contract has been terminated by the violation on the part of the assured of its conditions, then there can be no right of recovery. The compliance of the assured with the terms of the contract is a condition precedent to the right of recovery. If the assured has violated, or failed to perform the conditions of the contract, and such violation or want of performance has not been waived by the insurer, then the assured cannot recover. It is immaterial to consider the reasons for the conditions or provisions on which the contract is made to terminate, or any other provision of the policy which has been accepted and agreed upon. It is enough that the parties have made certain terms conditions on which their contract shall continue or terminate. The courts may not make a contract for the parties. Their function and duty consist simply in enforcing and carrying out the one actually made."

In the instant case it should be borne in mind that both the contract and the bond were prepared by the Board. In these circumstances the rule that where an insurance contract is so drawn as to be susceptible of two different constructions that most favorable to the insured will be adopted, loses much of its force. But in our view that rule has no application here for the rea-

son that the bond in this case is perfectly clear and definite. It is a fidelity bond, and viewed in that light it is, of course, of the highest importance to the surety to get prompt notice of a claim in order that all proper steps may be taken by it to reduce its loss. By almost universal custom fidelity bonds as now written require notice of default within a limited period of time, and that provision the courts enforce according to its strict terms. And in such a case it is immaterial whether the surety is able to show it was prejudiced by failure to receive notice, for the contract is enforced in accordance with its terms, and the question of prejudice does not affect the result. Notice is of the essence of the contract, and compliance with its terms is indispensable to fix liability. This is the rule so far as we know without exception in the federal courts. See Imperial Fire Ins. Co. v. Coos County, supra; Missouri Pac. Ry. Co. v. Western Assur. Co., C.C., 129 F. 610; San Francisco Savings Union v. Western Assur. Co., C.C., 157 F. 695; Bank of South Jacksonville v. Hartford Fire Ins. Co., D.C., 1 F.2d 43; New Amsterdam Casualty Co. v. Central Nat. Fire Ins. Co., 8 Cir., 4 F.2d 203; Harris v. North British & Mercantile Ins. Co., Limited, 5 Cir., 30 F.2d 94; Wachovia Bank & Trust Co. v. Independence Indemnity Co., 4 Cir., 37 F.2d 550; St. Louis Architectural Iron Co. v. New Amsterdam Cas. Co., 8 Cir., 40 F.2d 344; National City Bank v. National Security Co., 6 Cir., 58 F.2d 7; American Surety Co. v. Bankers' Savings & Loan Ass'n, 8 Cir., 59 F. 2d 577; Murray v. American Surety Co., 5 Cir., 69 F.2d 147; Public Warehouses v. Fidelity & Deposit Co., 2 Cir., 77 F.2d 831.

■ Here the requirement of notice was definitely made a condition of the bond, and the liability of the surety arose upon the breach only if the evidence thereof was given the surety within the thirty days.

This leaves only the question whether the provision for notice was complied with, or if not, whether compliance was waived. As was stated in the fore part of the opinion, the first notice given to or received by the surety was in a letter dated April 3, 1928. The last previous correspondence between the surety and the Board was a letter of October 11, 1922, to the Board from the representative of the surety, replied to by the treasurer of the Board October 24th. In the October 11th letter the representative, acknowledging notice to cancel the bond, asked that the Board advise the surety if any liability had developed while the bond was in force. The treasurer of the Board replied that he was then taking up with the auditing department the matter of having Sigsbee's accounts audited and would advise further in the near future. The "near future" did not arise for nearly six years. And yet the record shows that as early as April 8, 1921, the Board was withholding all compensation due Sigsbee until it could check up a mistaken overpayment of $50,-000. On September 9, 1921, an inter-office communication showed that Sigsbee's accounts were under inspection and survey. On July 25, 1922, the Board wrote to Sigsbee regretting its failure to effect a final settlement of its liability to the Board and stating: "there seems to remain but the usual course of resorting to legal procedure to enforce payment of the balance due from you to the Government, and I shall be obliged, therefore, to submit the matter to the Department of Justice for appropriate action."

On August 18, 1922, the Board advised Sigsbee that unauthorized funds had been taken by it out of the trust fund account to the extent of $81,682.59. On November 13, 1922, the Board wrote Sigsbee that a statement of account had been prepared for the purpose of commencing suit for the recovery of the moneys owed the Shipping Board. The Board then claimed a liability of $240,-000 but, accepting Sigsbee's own contentions, "around $100,000" was the amount due. Again on November 25, 1922, Sigsbee was notified by Mr. Lasker, Chairman of the Board, as follows: "I have made inquiries concerning the matter referred to in your letter of November 18th. I find that your account has been considered by several of our departments and is now before the Law Division, with a recommendation that suit be instituted."

Again finally on December 13, 1922, Sigsbee was notified by the general counsel of the Board as follows:

"I have examined the reports of our auditors and Assistant Counsel carefully, and concur in the conclusion that this account seems to indicate that you are indebted in the sum of $291,172.66. This figure is mentioned without prejudice to any amount that might develop upon a judicial accounting should it become necessary to resort to litigation.

"You have asked in your letter to the Chairman that a conference be arranged. A conference will be fruitless unless you have

some proposition to submit for payment of your indebtedness."

From the end of 1922 until the beginning of 1928 the whole matter slept. But in 1928 it was revived, and the claim in suit, amounting to more than $170,000, was asserted. Itemized in the bill of particulars, it is manifest that the sum now demanded covers the identical items referred to in the various letters which we have mentioned. From this, it is apparent that substantially all the facts on which is based the instant claim must have been known to the Shipping Board in 1922. It is of no consequence, therefore, that there may have been subsequent audits and checking and rechecking and that changes may have been made or additional amounts credited or additional amounts charged. The conclusion is inescapable that the Shipping Board was in possession of facts, in 1922, which from its point of view indicated that Sigsbee had improperly withdrawn moneys from the trust fund account, and it is these same withdrawals which the Shipping Board, without timely notice to the surety, is now seeking to recover. Since the Board had the evidence in 1922 it was, as we have said, its duty to bring the facts within its knowledge to the attention of the surety, and this obligation was a condition of the bond—doubtless in order that the surety might itself investigate and, as far as it could, then and there indemnify itself against loss. In these circumstances it would be to make a new contract for the parties to permit a recovery now, on the theory that the bond was one as to which liability accrued only upon a final accounting.

We are, however, asked to say that notwithstanding noncompliance by the Board with the condition in its contract with the surety as to notice, this action may be sustained on the theory of waiver. The basis of this contention is that after receipt of the Board's communication of April 3, 1928, the surety under date of October 3d notified the Board that it was in process of investigating the state of accounts between the Board and Sigsbee, and on January 4, 1929, following, advised the Board that, having made a careful investigation of the whole matter, it was of opinion that there had been no misappropriation. In denying liability, however, the surety company specifically also relied upon the failure of the Shipping Board to give the notice required by the bond. The same contention has been made before in cases of this nature but, so far as we know, never successfully. In the instant case there is nothing to show that when, in 1928, the belated notice was given to the surety it knew or had reason to suspect that the Shipping Board had had knowledge of the alleged defalcation ever since 1922. The notice to it from the general counsel of the Shipping Board made the matter to appear as then for the first time discovered. To say that under these circumstances the company, in accepting the notice and making its own independent investigation of the facts and then declining liability on the ground there had been no defalcation, thereby waived the notice condition of the bond, would be contrary to the general rule. Here, in addition, the denial of liability was predicated as much upon the failure to give notice as it was upon the lack of merit in the claim. In such circumstances there is neither waiver nor estoppel. The question is not new and has been disposed of contrary to the Board's claim. Globe Mut. Life Insurance Company v. Wolff, 95 U.S. 326, 24 L.Ed. 387; St. Louis Architectural Iron Co. v. New Amsterdam Cas. Co., supra; Commercial Casualty Ins. Co. v. Fruin-Colnon Cont. Co., 8 Cir., 32 F. 2d 425; Bank v. South Jacksonville v. Hartford Fire Ins. Co., supra; National City Bank v. National Security Co., supra; Murray v. American Surety Co., supra; Gordon v. Mass. Bonding & Ins. Co., 229 N.Y. 424, 128 N.E. 204; Basta v. United States, F. & G. Co., 107 Conn. 446, 140 A. 816; Sargent Mfg. Co. v. Travelers' Ins. Co., 165 Mich. 87, 130 N.W. 211. 34 L.R.A.,N.S., 491.

Affirmed.