**ALFALFA ELECTRIC COOPERATIVE, INC., a domestic cooperative corporation, Plaintiff,**

v.

**The TRAVELERS INDEMNITY COMPANY, a corporation, Defendant and Third Party Plaintiff,**

v.

**John R. HOOPER et al., Third Parties Defendant.**

**Civ. No. 72–753.**

United States District Court, W. D. Oklahoma.

Nov. 26, 1973.

---

Don Froemming, pro se.

Carroll M. White, pro se.

Beulah Vandruff, pro se.

## MEMORANDUM DECISION AND ORDER

CHANDLER, District Judge.

This action was originally filed in the District Court of Alfalfa County, Oklahoma, on October 16, 1972, but was thereafter removed to this Court. There is complete diversity of citizenship between plaintiff and defendant and defendant-third party plaintiff and third parties defendant, and more than $10,000.00 is in controversy; thus, jurisdiction exists.

The action of plaintiff, Alfalfa Electric Cooperative, is based upon a "Comprehensive, Dishonesty, Disappearance and Destruction Policy—Form B" issued by defendant and third party plaintiff, The Travelers Indemnity Company. It is alleged that plaintiff's former manager, John Hooper, committed acts of dishonesty resulting in plaintiff's suffering severe financial losses. Defendant answered by denying any dishonesty on the part of Hooper and, in the alternative, stated that if there was dishonesty, plaintiff has no coverage because of its failure to comply with the policy conditions precedent of (a) timely notice, (b) submission of proof of loss and (c) filing of suit. In addition, defendant contends that should the acts of Hooper be characterized as dishonest, then any coverage which the policy might have afforded was automatically terminated when plaintiff learned of similar, if not identical, acts occurring prior to the acts for which complaint is made and recovery sought. Defendant joined as third parties defendant John Hooper, plaintiff's former manager, as well as former Board members and past and present employees of plaintiff, alleging that if the actions of Hooper were dishonest and defendant is held liable to plaintiff, then those individuals owe to defendant indemnity (through subrogation) because they participated in the alleged

Ronald R. Hadwiger, Cherokee, Okl., and Shutler, Baker, Simpson & Logsdon, Kingfisher, Okl., for plaintiff.

John B. Hayes, Oklahoma City, Okl., for defendant and third party plaintiff, The Travelers Indem. Co.

Claude E. Love, Oklahoma City, Okl., for third party defendant John R. Hooper.

Harry R. Palmer, Jr., Oklahoma City, Okl., for third parties defendant, Harvey Weigand, Bill Bloyd, Harold Shaw, Glen Tharp, Edward Kennedy, M. H. French and Lawrence Maddox.

dishonest activities. The third parties defendant have generally denied any dishonest activity on their part.

The events giving rise to plaintiff's claim began occurring in May of 1969 when Hooper and various members of plaintiff's Board of Trustees set upon a course of conduct intended to benefit both plaintiff and the communities to which it served electrical power by bringing new industry into the rural areas. The ideas were engendered, in part, from U. S. Rural Electrification Association Bulletins (R.E.A. Bulletin 9–1) which suggested that participating cooperatives might lend assistance to worthwhile community projects. It was eventually decided by plaintiff's Board of Trustees that North Central Oklahoma Development Corporation (N.C.O.D.C.) would be formed for the purpose of bringing into the service community of plaintiff new industry, more jobs and eventually a larger market for plaintiff's electrical power. When N.C.O.D.C. was formed, plaintiff's individual Board members served as directors and plaintiff owned its stock. Plaintiff's Board authorized an initial investment of $50,000.00 so that N.C.O.D.C. might ac-quire, attract or otherwise bring industry into the area. Between August, 1969, and the middle of March, 1970, plaintiff, through Board action for which there is approved written minutes, authorized the investment in N.C.O.D.C. by plaintiff of several thousands of dollars, in addition to pledging on behalf of N.C.O.D.C. various bonds and certificates of deposit as collateral against loans. Apparently because of plaintiff's application to the R.E.A. for a loan of additional government funds, a field representative of R.E.A. examined plaintiff's books and voiced objection to the rather substantial investments made by plaintiff in or on behalf of N.C.O.D.C. From the uncontroverted record, it clearly appears that the R.E.A. representative would not recommend the additional loan unless plaintiff liquidated its investment in N.C.O.D.C. and the Board members resigned their positions as di-rectors. The individual Board members thus resigned as directors of N.C.O.D.C. and resolved that " . . . the General Manager (John Hooper) be entrusted to appoint other principals in the company and the manager be instructed to liquidate (plaintiff's) investment in N.C.O.D.C. as fast as possible . ' . ." (April 3, 1970 meeting.)

Immediately following this action by plaintiff's Board of Trustees, it authorized and approved the pledging of plaintiff's assets as collateral to secure a loan by N.C.O.D.C. at First National Bank of Oklahoma City. The proceeds of that loan were used to "liquidate" (pay) approximately $139,000.00 of N.C.O.D.C.'s debt to plaintiff, but left plaintiff contingently liable under the collateral pledge. The mechanics of what transpired are relatively simple. N.C.O.D.C. was indebted to plaintiff in excess of $139,000.00. N.C.O.D.C. had no credit and could not borrow money to "liquidate" or pay its debts to plaintiff without the guaranty or collateral pledge of plaintiff or someone else. Hooper, on behalf of N.C.O.D.C., negotiated the loan with the bank contingent upon plaintiff pledging as collateral a certificate of deposit in a like sum. Plaintiff's Board approved the collateral pledge, the bank advanced the money and used it to purchase for plaintiff a certificate of deposit which was then used as collateral for the loan. Possession of the certificate of deposit was retained by the bank and a joint custody receipt issued to plaintiff. Plaintiff's books were then changed to reflect that N.C.O.D.C. had paid $139,000.00 and that plaintiff was the owner of a certificate of deposit in like amount which had been pledged to the bank. In substance, plaintiff's account or note receivable from N.C.O.D.C. was converted to a contingent liability of plaintiff in the form of a collateral pledge. It is immaterial that the certificate of deposit generated by the loan was used as collateral since the net effect would have been the same had plaintiff authorized the use of other collateral. Plaintiff did not lose any mon-

ey as a result of this transaction. Unfortunately, at a later date, N.C.O.D.C. was unable to repay the loan and the collateral pledge was foreclosed by the bank. Whether plaintiff's Board members were fully aware of the details of the transaction is also immaterial since it is clear that they specifically authorized the pledging of the certificates of deposit.

Chronologically, the transaction just described is the first one complained of by plaintiff. The remainder of the claim consists of alleged losses resulting from checks being written by plaintiff to N.C.O.D.C. as loans between August 14 and October 29, 1970, some of which were repaid and some of which were not. Each check was signed by an appropriate officer of plaintiff and approved by its treasurer who was also a member of the Board. There seems to be some question as to whether the checks were approved before or after their issuance, but the Court finds that the timing is immaterial because the fact remains that they were approved, came to the attention of the Board and that no complaint or objection was voiced until it was suggested by others that Hooper was dishonest. The record indicates that checks written by plaintiff were always reviewed at its periodic Board meetings. Minutes of the meetings which followed issuance of the checks do not disclose any objection or complaint being made about the additional loans to N.C.O.D.C. Answers to interrogatories indicate their approval, particularly the action of the Board in directing Hooper to obtain promissory notes from N.C.O.D.C. so that there would be no question about the indebtedness.

A special Board meeting was held on November 8, 1970, for the purpose of discussing the possibility of repayment of the loans plaintiff had made to N.C.O.D.C. Hooper reported that repayment at that time was impossible. A former R.E.A. representative attended the meeting as a financial consultant for plaintiff. It was he who suggested that an investigation be conducted and a claim be filed with defendant if it appeared proper. Hooper declined the Board's request to resign until he reminded the trustees that they had been fully aware of the amount of funds and collateral provided by plaintiff for N.C.O.D.C. None of the trustees took exception with Hooper's statement so far as the record reflects but, instead, voted him thirty days' separation pay.

Six days later on November 14, 1970, plaintiff notified defendant by letter that it had "tentatively discovered a discrepancy" of its "securities and other funds and have acted in the capacity of relieving John R. Hooper from the duties of manager." A complete audit was promised at which time plaintiff asserted it would be "able to ascertain any degree of dishonest action by said employee."

Approximately six months thereafter defendant was requested, by letter dated May 14, 1971, from the R.E.A. to voluntarily extend the policy period (four months from the discovery of the loss) for filing proof of loss until September 24, 1971. On June 21, 1971, the R.E.A. (which appears to be a policy beneficiary), not plaintiff, was advised by defendant that time for filing proof of loss had long since expired. However, defendant stated its willingness to grant the request provided certain conditions were met and provided it was "understood that the granting of this conditional extension of time . . . does not waive any of the conditions, provisions or limitations of (the policy) or any of our rights at law." A proof of loss was eventually filed with defendant. The proof was rejected by defendant on April 4, 1972, yet this action was not commenced until October 16, 1972.

The Court is of the opinion that no genuine issue exists concerning the basic and material facts summarized above although counsel, through argument, has characterized the facts differently in some respects. The Court is of the opinion that from these basic facts, plus others hereafter mentioned, it is possible to isolate, analyze and pass upon the le-

gal issues raised by defendant's motion for summary judgment. The legal issues are discussed by category for convenience only.

## DISCOVERY OF LOSS

■ The policy in question, similar to many others, conditions coverage upon the insured plaintiff (or the R.E.A.) notifying defendant insurer "within a reasonable time after discovery" by the insured plaintiff (or the R.E.A.) of any covered loss. Other conditions which must be met by plaintiff are also timed from the "discovery" date. It is not unusual, therefore, that the definition of discovery has been judicially construed many times. Despite the years of litigation, the definition set forth in American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898), continues to reappear as the basic yardstick, even though the jury instruction approved by the Court is stated in the negative. Paraphrased, "discovery" means that time when the insured gains sufficient factual knowledge, not mere suspicion, which would justify a careful and prudent man in charging another with dishonesty. An oversimplification of the definition is that when the insured learns the facts constituting the alleged dishonesty his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constitutes "discovery." Thus, in Hidden Splendor Mining Co. v. General Ins. Co. of America, 370 F.2d 515 (10 Cir. 1966), the Court held that the insured knew or had reason to believe there had been employee dishonesty long before it was reported to the carrier because it was knowledgeable of the basic facts and that such knowledge properly could not be characterized as "suspicion." Knowledge is what a reasonable person should have concluded from known facts. *Hidden Splendor* cites *Pauly* along with American Employers' Ins. Co. v. Raton Wholesale Liquor Co., 123 F.2d 283 (10 Cir. 1941), in which the Court states:

"... the Raton Company was not required to report merely suspi-

cious conduct, *but rather only knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty* . . ." (Emphasis added.)

When is a careful and prudent man justified in charging another with dishonesty? Certainly he is justified when he learns those facts which are later asserted to constitute acts of dishonesty. Reaching the conclusion of dishonesty cannot be delayed by claiming knowledge of facts to be mere suspicions. It was, therefore, held in St. Paul Fire and Marine Ins. Co. v. Bank of Stockton, 213 F.Supp. 716 (N.D.Calif. 1963), that "discovery" is synonymous with the acquiring of facts, not when the insured finally decides that the facts claimed to support forgery may be truthful. Coverage was denied in that case because of a five-month delay in reporting, during which time the insured was contemplating whether or not it should believe the facts it had acquired. Similarly, in J. S. Fraering, Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 242 F.2d 609 (5 Cir. 1957), the Court held that discovery occurs when an insured learns of the facts constituting dishonesty, even if the dishonesty results in very small losses for which no policy claim is made.

■ Under the authorities just cited, when did plaintiff discover the alleged "dishonesty" for which claim is now being made? Plaintiff unquestionably discovered the alleged dishonesty involved in the first cause of action on April 3, 1970, and most probably much sooner. All of the facts were known to the Board at that time or earlier. The record reflects that on February 16, 1970, plaintiff's Board formally authorized Hooper to pledge certificates of deposit to the bank. On March 23, 1970, similar authorization was issued concerning a treasury note in the amount of $100,000.00. Then, on April 3, 1970, plaintiff's Board, immediately following its resolution directing Hooper to "liquidate" plaintiff's loans to N.C.O.D.C., authorized Hooper to pledge plaintiff's cer-

tificates of deposit to the bank as security for notes made by N.C.O.D.C. That action was followed up on April 17, 1970, when Harold Shaw, plaintiff's Board president, wrote a letter to the bank stating that plaintiff approved the act of Hooper in securing a large loan and using plaintiff's certificate of deposit as collateral, and also acknowledged Hooper's authority to secure a previous $95,000.00 loan with plaintiff's $100,000.00 treasury note. An almost identical letter was signed by all of plaintiff's Board members and certified by the secretary on April 20, 1970. Ironically, on that same date plaintiff's Board authorized and directed that its ownership of N.C.O.D.C. be sold to Hooper for $1.00.

Plaintiff makes no factual assertion in opposition to the motion for summary judgment that the facts later acquired by plaintiff were any different than those which the Board had knowledge as the events occurred. The Court has no alternative but to conclude that plaintiff "discovered" what it now claims to be dishonest acts in February, March and April, 1970, several months prior to the reporting date of November 14, 1970. What the Board admittedly did not know was the ultimate propriety of the business judgment exercised when it committed plaintiff's assets to secure loans of N.C.O.D.C.

■■ With reference to the second cause of action, the facts are very similar. Plaintiff alleges an unauthorized loan of August 14, 1970, which was admittedly repaid on August 17, 1970. The check was signed by Hooper and plaintiff's office manager, and initialed as approved by plaintiff's secretary-treasurer and a Board member. Since plaintiff does not contend that either the office manager or the secretary-treasurer and Board member were dishonest, or otherwise in collusion with Hooper, then plaintiff is charged with their knowledge since under the policy discovery by the insured ". . . shall be deemed to mean discovery by any officer or employee of the insured not in collusion

with the employee responsible for the loss discovered . . . ." The inescapable conclusion is that one of plaintiff's employees knew about the alleged unauthorized loan on the date the check was written and an officer and Board member knew about it the day it was initialed, even though there is some question as to whether or not it was initialed on the day it was issued or when it was returned by the bank after payment. Even without a policy provision defining whose knowledge is imputed to the insured, the authorities support the assertion that knowledge of nonparticipating employees and officers is imputed to the insured. It was held in Kornhauser v. National Surety Co., 114 Ohio St. 24, 150 N.E. 921 (1926), that when one who is a director, assistant secretary and treasurer of the insured knew of the employee dishonesty, such knowledge is chargeable to the insured, and failure to convey such knowledge to the carrier as required by the bond precludes recovery thereon. See also National Discount Co. v. U.S.F. & G. Co., 47 Misc. 678, 94 N.Y.S. 457 (1905), in which the same result was reached where the insured's secretary, superintendent, bookkeeper and acting cashier had knowledge of the dishonesty.

The remaining causes of action fall into the same category. All of them represent alleged unauthorized loans made in September and October, 1970, and all of them were known to the Board in the same manner as was the loan involved in the first cause of action. In fact, all of the loans were reviewed by the Board in its meeting of October 27, 1970. No complaint appears in the minutes about the loans having been made dishonestly by Hooper. Many similar loans were made prior to the one of August 14, 1970 (second cause of action). Five additional loans were made thereafter and through October, 1970. Since plaintiff's bookkeeper, its secretary-treasurer and the Board were aware of each and every loan either before or shortly after they were made, the only logical conclusion is that

plaintiff "discovered" the loans as they were made.

■■ At this point it should be emphasized that "discovery" of dishonesty under the policy in suit starts the time running on (a) notice, (b) proof of loss, (c) policy coverage termination, and (d) time within which to file suit. Furthermore, "discovery" means knowledge of the first dishonest act, not just the acts for which claim is made and not just each subsequent act as it occurs. Defendant did not agree to insure plaintiff against an employee's acts which occurred after plaintiff discovered the employee to be dishonest. Since there were many loans made between May, 1969, and April, 1970, when plaintiff instructed Hooper to "liquidate" the loans, yet at the same time authorized him to pledge plaintiff's assets as collateral, it can certainly be theorized and logically argued that plaintiff "discovered" the alleged dishonesty of Hooper as early as 1969 when the first loan was made for which there was no specific mention in plaintiff's Board minutes, since those loans prior to April 3, 1970, were made under almost identical circumstances to those made subsequent to that date. Having established plaintiff's knowledge of the material facts and what constitutes "discovery" under the terms of the policy, it is now proper to consider arguments asserted with respect to the policy conditions.

## TIMELY NOTICE OF LOSS

■ Plaintiff's obligation to give defendant notice "within a reasonable time after discovery" of employee dishonesty is unquestionably a condition precedent to coverage under Oklahoma law. In U. S.F. & G. Co. v. Gray, 106 Okl. 222, 233 P. 731 (1925), the Court held that no liability attaches unless the specified notice is given. The *Gray* case quoted from Shawnee Fire Insurance Co. v. Beaty, 64 Okl. 61, 166 P. 84 (1917), as follows:

"The conditions in an insurance policy prescribing the time and manner of giving notice of loss, and the method of ascertaining the amount of loss, must be complied with before suit is commenced to recover on the policy; and a demurrer should be sustained to a petition that exhibits the policy containing such conditions, but does not plead that such conditions were complied with or waived before suit was commenced."

Another Oklahoma case directly in point is Kerr v. Aetna Casualty & Surety Co., 124 Okl. 112, 254 P. 105 (1927). See also Gray v. Reliable Ins. Co., 26 Okl. 592, 110 P. 728 (1910) and Fidelity & Deposit Co. of Maryland v. U.S.F. & G. Co., 179 Okl. 174, 64 P.2d 672 (1935), both of which explain that such policy provisions are valid despite an Oklahoma Constitutional prohibition against placing limitations upon existing liability.

The question thus becomes whether or not plaintiff gave the condition precedent notice "within a reasonable time after discovery." If the alleged first "dishonesty" was "discovered" in the middle of February, 1970, then notice came nine months later. If "discovery" was not until March, 1970, then notice was at least eight months later. Notice followed the April 3, 1970, meeting by seven and one-half months. If, on the other hand, the events occurring prior to February 16, 1970, are taken into consideration because they were all but identical to those occurring in February, March, April, August, September and October, 1970, then notice was even longer than nine months after "discovery." Before determining whether notice on November 14, 1970, was in a reasonable time after discovery, it should first be determined whether the question is a factual or legal one.

■■ Where the facts are undisputed, timeliness of notice is a question of law. Dixie Fire Ins. Co. v. American Bonding Co., 162 N.C. 384, 78 S.E. 430 (1913). Similarly, where the lapse of time in giving notice is so long as to be obviously in noncompliance with the policy, then timeliness is a question for the

Court, not the jury. Andrews v. Minter Coal & Coke Co., 90 Ind.App. 320, 168 N.E. 869 (1929); Fidelity & Guaranty Co. of N.Y. v. Western Bank, 29 Ky.L.R. 639, 94 S.W. 3 (1906); and Employers' Liability Assurance Corp. v. Stanley Deposit Bank, 149 Ky. 735, 149 S.W. 1025 (1912).

The facts in this case are undisputed, and the lapse of time between discovery of facts and reporting is long enough to be considered not in compliance with the policy condition precedent. Employee dishonesty is a serious matter and a "reasonable time" to report it would certainly appear to be shorter than reporting an automobile accident under a liability policy, yet the Courts have held that under liability policies a reasonable time is much shorter than nine months. Several examples are footnoted.[1]

If it is assumed for notice purposes that the acts of Hooper complained of by plaintiff are dishonest, then plaintiff obviously "discovered" a policy loss which it did not report within a reasonable time. If, on the other hand, the events which occurred prior to October, 1970, are ignored, there might be some plausible factual question as to whether or not notice was timely given. However, the Court need not consider this possibility for reasons hereafter explained. Suffice it to say that plaintiff, assuming the alleged dishonesty to be a fact, did not give timely notice which was a condition precedent to liability of defendant under the policy.

## TIMELY FILING OF PROOF OF LOSS

Filing proof of loss, like timely notice, is a condition precedent to liability under the policy in question, not a limitation upon existing liability. The policy requires that the proof be filed "within four months after such discovery." Proof of loss was not filed until August 17, 1971, some nine months after notice was given and after the claimed discovery date of November 14, 1970. It was approximately six months after notice (November 14, 1970) that the R.E.A. requested an extension of time within which to file proof of loss, and a little over seven months before defendant granted a conditional extension (June 21, 1970). Since the proof of loss obviously was not timely filed, the only issue is whether or not defendant is estopped to raise or has otherwise waived the condition precedent.

Plaintiff contends that defendant waived timely filing of proof of loss in its letter of June 21, 1971. Because of the importance of the letter, the majority of it is set forth in a footnote.[2]

---

1. Notice nine months and twelve days after discovery was not reasonable. Muncie Banking Co. v. Am. Sur. Co. of N. Y., 200 F.2d 115 (7 Cir. 1952). Nine months after discovery was not at the "earliest practicable time." Mt. Vernon Bank & Trust Co. v. Aetna Casualty & Surety Co., 224 F.Supp. 666 (D.C.Va.1963). Two and seven years are obviously too late. Hartford Fed. Sav. & Loan Assoc. v. Aetna Casualty & Surety Co., 25 Conn.Sup. 418, 206 A.2d 650 (1964) and U. S. Shipping Bd. Merchant Fleet Corp. v. Aetna Casualty & Surety Co., 68 App.D. C. 366, 98 F.2d 238 (D.Col.1938). Four and one-half months is not "immediately." George J. Ricau & Co. v. Indemnity Ins. Co., 173 So. 217 (La.App.1937). Two years is not "as soon as possible." Morrellville Dep. Bank v. Royal Ind. Co., 294 Pa. 446, 144 A. 424 (Pa.1928). On the other hand, eight to ten days is timely. F & D Co. of Md. v. Courtney, 186 U.S. 342, 22 S.Ct. 833,

46 L.Ed. 1193 (Ky.1902); Perpetual Bldg. & Loan v. U.S.F. & G. Co., 118 Iowa 729, 92 N.W. 686 (1928).

2. "It would appear that the Rural Electrification Administration was notified of this matter when they received a carbon copy of the November 14, 1970, letter to this Company from the Alfalfa Electric Cooperative. This being the case, it would appear that the four-month period for filing the Proof of Loss, as provided in the bond, has long since expired.

"We are willing to grant an extension of time for filing a Proof of Loss until September 24, 1971, provided we are furnished with a written report setting forth the known details of this matter on or prior to July 15, 1971. If we are not furnished with the requested report, we will consider that the extension is null and void. It should also be understood that the granting of this condi-

In response to an R.E.A. inquiry, defendant reminded the insured that the conditional extension did not waive any policy provisions or defenses. After receiving the proof of loss, defendant informed plaintiff by letter dated September 10, 1971, that the proof had been received and that an investigation would follow, but that "should not be construed as an admission of liability or a waiver of any of the conditions, provisions, or limitations" of the policy "or any of our rights by law."

■ Did the June 21, 1971, letter of defendant completely excuse plaintiff from the policy condition precedent of timely filing of proof of loss? I believe not. First, when plaintiff notified defendant on November 14, 1970, it spoke of "tentative discrepancies." At that point defendant was not aware that plaintiff had anything other than suspicions of employee dishonesty. As we have previously established, notice is not required until the insured actually discovers a covered loss, not merely suspicions one. Secondly, defendant informed the R.E.A., who requested the extension, that the extension was being granted under certain conditions and with the understanding that it was not a waiver of any policy conditions, provisions or limitations. The language of the letter does not indicate and I do not believe that defendant intended to unconditionally waive the time within which to file proof of loss covering claims for which plaintiff had knowledge many, many months previously. The request for extension made by the R.E.A. affirms the fact that a "potential claim" is under consideration. It is the opinion of the Court that a reasonable person would have no alternative but to consider that under the circumstances defendant was merely extending to plaintiff and the R.E.A. a courtesy which it was not required to do, not an outright waiver of anything. Had both plaintiff and the R.E.A. informed defendant that it had known the facts for many, many months, it is highly improbable that defendant would have done anything other than immediately deny the claim because of untimely notice and failure to timely file proof of loss. Furthermore, it would be inequitable to hold that defendant knowingly waived its policy conditions precedent since both plaintiff and the R.E.A. failed to fully advise defendant before the June 21, 1971, letter was written that they had both known the facts for many months. This is the application of the principle of waiver and estoppel in reverse. In Kerr v. Aetna Casualty & Surety Co., 124 Okl. 112, 254 P. 105 (1927), the Oklahoma Supreme Court, in a similar case, quoted from Security Ins. Co. of New Haven v. McAlister, 90 Okl. 274, 217 P. 430 (1923), as follows:

> "In order for the acts and conduct of the insurer to estop it from claiming forfeiture of the policy, it must appear that the acts or conduct of the insurer misled the insured and caused him to alter his situation to his prejudice.
>
> "Where the acts of the insurer show an intention to relinquish the right of forfeiture for failure to give proof of loss, such acts will be held to constitute a waiver, and in such cases the facts need not be such as to amount to estoppel . . . ."

■ By the same token, the insured should not be able to acquire from the insurer a waiver of policy conditions precedent by either misrepresentation or by the failure to inform the insurer of the existing facts. Furthermore, defendant did nothing which misled plaintiff and caused it to alter its situation to its prejudice, and there is no evidence that defendant was aware of the extent of plaintiff's prior knowledge of the facts now asserted to be dishonest. Under these circumstances the Court cannot conclude and does not believe that a reasonable person would conclude that

---

tional extension of time for filing a Proof of Loss does not waive any of the conditions, provisions, or limitations of Bond CDB–1090901 or any of our rights at law."

defendant did not specifically reserve the right to reject the proof of loss as not being timely filed. The evidence does, however, reflect that defendant intended to and did suspend the time for filing proof of loss from and after June 21, 1971, until September 24 of that same year.

Although in answers to interrogatories plaintiff stated that it did not rely upon any verbal promises or extension of time within which to file proof of loss, the same person who answered the interrogatories executed an affidavit in opposition to defendant's motion for summary judgment which at least infers that there was a verbal extension. The facts as set forth in that affidavit were more fully explained in an affidavit filed by defendant's adjuster who, it was inferred, may have verbally extended the time. Nevertheless, the facts set forth in the affidavit filed by plaintiff do not constitute a verbal waiver, and even if they did it would have been for only a reasonable time, and a reasonable time had long since expired by June 21, 1971. The Court concludes as a matter of law that plaintiff failed to comply with the condition precedent in the policy of timely filing of proof of loss.

## TIMELY FILING OF SUIT

The policy also required, as a condition precedent to coverage and liability, not as a limitation upon existing legal remedies, that suit be filed within two years from the date the loss was discovered. Suit was not filed until October 16, 1972, and the case was subsequently removed to this Court. Since it has been determined that the very latest "discovery" date for the various alleged dishonest acts was the date upon which each of the checks was written and co-signed by a non-participating employee, the two-year period within which to file suit expired on all of plaintiff's claims before October 16, 1972, except for checks dated October 16, 1970, in the amount of $15,000.00 and October 20, 1970, in the amount of $14,000.00.

However, as heretofore noted, discovery dates as late as October 16 and 20, 1970, are unrealistic under the contentions of plaintiff. Either prior loans made in a similar manner were dishonest or they were not. If they were dishonest, then plaintiff discovered dishonesty long before October 16 or 20, 1970. The only logical conclusion to be reached from the evidence submitted is that plaintiff discovered alleged dishonest acts long prior to October 16 or 20, 1970, and the time within which to file suit expired before suit was actually filed.

Although plaintiff has not cited any authorities in opposition to this contention of defendant, the Court is not unaware of an Oklahoma Constitutional provision which prohibits shortening an existing Statute of Limitation, which on written agreements in Oklahoma is five years. Likewise, the Court is aware of some authorities which hold that similar policy provisions are not conditions precedent to liability, but limitations upon the time within which suit may be brought. The Oklahoma Constitutional provision prohibits the shortening of a statutory limitation unless it is authorized by statute. It would, therefore, be unnecessary to conclusively hold that the policy provision is a condition precedent to liability since 36 O.S., § 3617, would appear to authorize a two-year limitation for actions on a policy like the one now before the Court. The Court concludes as a matter of law that suit was filed untimely, whether the policy provision be considered a condition precedent to liability or a limitation upon the right to bring action.

## TERMINATION OF COVERAGE

The policy in question also has a provision which provides that "dishonesty" coverage is terminated "immediately upon discovery by the insured" of any "fraudulent or dishonest act on the part of such employee . . ." Therefore, the moment plaintiff discovered any act of dishonesty on the part of John Hooper (not just one for which claim is made in this lawsuit), coverage

for him under the policy automatically terminated. Such provisions are valid and enforceable. See, for example, J. S. Fraering, Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 242 F.2d 609 (5 Cir. 1957). A case involving Oklahoma law is U.S.F. & G. Co. v. State of Okla., 43 F.2d 532 (10 Cir. 1930), where the Court concluded (p. 537):

"Upon such discovery, the bond, by its express terms terminated. It follows that the court erred in permitting recovery on account of breaches of the bond which occurred after it had terminated."

There are many similar cases decided by other jurisdictions which involve the precise issues.[3] Even where there is no provision automatically terminating coverage, it has been held to be a breach of good faith to maintain the agent in a position of trust after discovering his defalcations without notifying the fidelity carrier and giving it an opportunity to decide whether or not it desires to continue as insurer. See Aetna Insurance Co. v. Fowler, 108 Mich. 557, 66 N. W. 470 (1896), and Phoenix Insurance Co. of Hartford v. Newell, 60 Okl. 207, 159 P. 1127 (1916).

When did plaintiff first discover the alleged dishonest acts of Hooper? Previous portions of this opinion have dealt with that question at length, and it would be unnecessarily repetitive to restate the facts. Suffice it to say that if, as plaintiff alleges, the First National Bank transaction set forth in the first cause of action is dishonest, then coverage terminated no later than April 3, 1970, and probably as early as February, 1970. Similarly, the second cause of action arises out of a loan purportedly made on August 14, 1970, and repaid on August 17, 1970, and that loan came to the attention of plaintiff's employee, officer and director amost immediately. If either of these transactions was dishonest, then all of the subsequent acts of Hooper are not covered by the bond. The same reasoning can be applied to each and every transaction which plaintiff claims to be dishonest. Knowing the facts, plaintiff was perfectly free to retain Hooper in a position of trust if it chose to do so, but defendant did not agree to continue to insure against his possible acts of dishonesty. Under these facts the Court has no alternative but to conclude that coverage definitely terminated on April 3, 1970, and certainly no later than August 14, 1970, the date upon which the first of a series of checks was written. Since notice, proof of loss and filing suit were untimely as to the transactions of April 3 and August 14, 1970, plaintiff does not have a valid action against defendant.

## WAS THERE EMPLOYEE DISHONESTY?

Having previously determined that defendant should be granted summary judgment, the Court hesitates to discuss the evidence presented to sustain the allegations of dishonesty against Hooper, but for the fact that the integrity and honesty of not only Hooper but plaintiff's former Board of Trustees have been publicly challenged. The Court feels an obligation to comment upon this evidence and make legal conclusions if for any reason the foregoing legal conclusions are not sustained on appeal.

The concept of N.C.O.D.C. was nothing less than noble and its formation was obviously entered into in good faith by plaintiff and all concerned. The

3. Larson v. Peerless Ins. Co., 362 S.W.2d 863 (Tex.Civ.App.1962); First Fed. Sav. & Loan Ass'n v. Commercial Union Ins. Co., 115 Ga.App. 756, 156 S.E.2d 101 (1967); Verneco, Inc. v. Fid. & Cas. Co., 253 La. 721, 219 So.2d 508 (1969); U. S. F. & G. Co. v. Constantin, 247 Miss. 812, 157 So.2d 642 (1963); Miners Sav. Bank v. Royal Indemnity Co., 336 Pa. 428, 9 A.2d 543 (1939); Supreme Ruling, F. N. C. v. National Surety Co., 114 App.Div. 689, 99 N. Y.S. 1033 (1906); Roseville Trust Co. v. National Surety Co., 95 N.J.L. 138, 112 A. 337 (1920); Guarantee Co. of N. A. v. Mechanics' Savings Bank and Trust Co., 183 U.S. 402, 22 S.Ct. 124, 46 L.Ed. 253 (1902); and Alabama Fidelity and Casualty Co. v. Alabama Penny Svgs. Bank, 200 Ala. 337, 76 So. 103 (1917).

Board minutes speak for themselves. It is also obvious that the difficulty first arose and the integrity of individuals concerned was questioned only after an R.E.A. representative examined plaintiff's records in connection with an application for a loan. The R.E.A. objected to plaintiff's participation in N.C.O.D.C. and suggested that plaintiff divest itself as soon as possible if it desired to obtain the applied for loan. The debacle followed. Neither this Court nor anyone else will ever know whether or not N.C.O.D.C. would have been a success or failure had the R.E.A. representative not made the divestitive requirement. When N.C.O.D.C. failed for lack of capital, Hooper and plaintiff's former Board of Trustees were subject to public and private criticism, aided, of course, by hindsight. In fact, Hooper was charged with a federal crime and thereafter exonerated in this court by another District Judge. The record reveals that the charge did not exactly parallel the claims made in this lawsuit, but the two were not completely dissimilar. The Court is not, of course, either inferring or holding that exoneration from criminal charges exonerates one from civil liability.

The minutes of the meetings of plaintiff's Board of Trustees reflect that most every act for which Hooper is now accused of being dishonest was either specifically approved in advance or subsequently ratified. Although those acts may have appeared later to be unwise, they do not appear to have been dishonest. The fact that plaintiff's Board of Trustees may not have understood all of that which it approved at a time when it had all of the facts at its disposal does not make the acts dishonest. Otherwise, there would never be stability in the conduct of corporate affairs and the meaning of "dishonesty" would degenerate to bad or unwise judgment.

Even the most liberal definition of dishonesty does not include good faith business judgment which results in financial disaster. Justice Cardozo, in World Exchange Bank v. Commercial Casualty Co., 255 N.Y. 1, 173 N.E. 902 (1930), gives the word dishonesty a very broad meaning. Nevertheless, the facts of that case serve as a perfect corollary to the facts now before the Court. Justice Cardozo stated:

". . . dishonesty within such a contract may be something short of criminality . . . (citations omitted). The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men."

In that case it was held that a teller made an innocent mistake but had not been dishonest. With the aid of perfect hindsight it is obvious that Hooper and the Board of Trustees may have made innocent but unwise business judgments. However, the fact remains that he was joined in his actions by his superiors—the Board of Trustees. If Hooper was dishonest, then plaintiff was also dishonest because its Board of Trustees approved or ratified each and every act taken by Hooper.

Had the economic climate been different in the latter part of 1970, then Hooper may well have been a hero instead of the scapegoat which he is made to appear in this litigation. In retrospect, it may well have been bad judgment or even aggravated stupidity for plaintiff to have entered into such a massive undertaking for the benefit of itself and the various communities which it served, even though the intent was good and not for anyone's personal gain.

The rule of law applicable to the facts now before the Court is summed up in an article by James A. Knox, "The Financial Institution Bond—Traditional Fidelity Coverage or Coverage for Corporate 'Goofs'?", The Forum, Volume

VIII, Number 2, Winter, 1972, at page 309, as follows:

"It is not a breach of fidelity or an act of dishonesty to have acted openly and without concealment with approval or with ratification by the employer. Of course, under these circumstances the act of the employee becomes the act of the employer."

It is the opinion of the Court that on the factual issue of dishonesty the minds of reasonable men would not differ, and the inescapable conclusion under the facts presented is that Hooper acted honestly.

Counsel for defendant is directed to prepare and present to the Court a judgment sustaining defendant's motion for summary judgment and providing that the third party complaint is to be dismissed upon the order becoming final and nonappealable since it will have been rendered moot.