949 F.2d 1067
 ADAIR STATE BANK, an Oklahoma Banking Corporation,
Plaintiff-Appellee/Cross-Appellant,
v.
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,
Defendant-Appellant/Cross-Appellee.
ADAIR STATE BANK, an Oklahoma Banking Corporation, Plaintiff-Appellee,
v.
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA,
Defendant-Appellant.
 Nos. 89-5194, 89-5197, 90-5153.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 25, 1991.
 
 Thomas H. Crouch of Meagher & Geer, Minneapolis, Minn. (Thomas M. Stieber and Charles H. Becker of Meagher & Geer, Minneapolis, Minn., and Michael Hill of Secrest & Hill, Tulsa, Okl., with him on the briefs), for defendant-appellant/cross-appellee.
 Robert W. Nelson of Ramey, Nelson & Brown, Yukon, Okl. (David W. Edmonds and Brian Husted of Edmonds, Cole, Hargrave, Givens & Witzke, Oklahoma City, Okl., with him on the briefs), for plaintiff-appellee/cross-appellant.
 Before McKAY, Chief Judge, LOGAN, Circuit Judge, and WINDER,[1] District Judge.
 McKAY, Chief Judge.
 
 
 1
 An insurer in this diversity action challenges the judgment of the United States District Court for the Northern District of Oklahoma awarding indemnity on an employee fidelity bond the insurer issued to a bank. The district court found that the bond covered the defalcation of the bank's chairman of the board. The insured cross-appeals the judgment of the district court in favor of the insurer on its claim that the insurer breached its duty of good faith and fair dealing. Finally, the insurer appeals the amount of attorney fees awarded by the district court to the insured under the state statute. We consolidate the appeals for purposes of our review.
 
 I.
 
 2
 This case arose from a check-kiting scheme perpetrated against Adair State Bank by Harold Dunham, the chairman of the bank's board of directors, who co-owned the controlling shares of the bank's stock and maintained a checking account there. He also maintained a checking account at the Bank of Chelsea, an affiliated bank of which he was also a co-owner.
 
 
 3
 Mr. Dunham's scheme began in May 1985 when he wrote a $55,000 check on his Adair checking account but had insufficient funds to cover it. He instructed a bank employee to hold the check and show it on the bank's books as a cash item. The bank honored the check, rather than returning it to the payee for insufficient funds, and Mr. Dunham's account was not shown as overdrawn. The chairman obtained funds the next day to cover the check.
 
 
 4
 Overdrafts on Mr. Dunham's account soon became routine at Adair State Bank. In July 1985 Mr. Dunham wrote a check in excess of $100,000 for which his account held insufficient funds. This time, however, he was unable to come up with the funds after the check was placed on the books of Adair as a cash item. Mr. Dunham instead deposited into his Adair account a check drawn on his account at the Bank of Chelsea, for which there were also insufficient funds. To avoid an overdraft at Chelsea, Mr. Dunham then drew another check, for which there were insufficient funds, on his Adair account and deposited that check in his Chelsea account. When that check was returned to Adair for payment, it was placed in the cash items account. From July 1985 to March 1986, Mr. Dunham engaged in this scheme repeatedly. He would write a check on his Bank of Chelsea account at the end of each month to clear the bad checks being held on Adair's books as a cash item. The large amount would not show up on the end-of-the-month computer reports which went to the board of directors at Adair. At the beginning of each month he would cover the check he had written on his Chelsea account by writing a check on his Adair account. Hence, the last Adair check would not arrive at Adair for collection until after the end of the month, and the Chelsea check would not show up as an overdraft for review by the board of directors. By September or October his overdrafts exceeded $200,000, and by March 1986 they exceeded $500,000.
 
 
 5
 To succeed in his scheme, Mr. Dunham required the assistance of a few of Adair's officers. The parties agree that three of the insured's officers knew about some or all of Mr. Dunham's scheme. In the summer of 1985, Marsha Hall, a vice president and cashier at the bank and cousin of Mr. Dunham, discovered a correlation between a list of overdrafts from Mr. Dunham's account and an unusually high balance in the bank's daily cash items report. She knew that Mr. Dunham had directed that the overdrafts be placed in cash items and that the checks were cleared from cash items at the end of the month. She also knew that the pattern recurred month after month. Ms. Hall questioned this practice in a conversation with Charles Floyd, the bank's president. Mr. Floyd admitted that he had spoken about the overdraft problem with Mr. Dunham, who had assured him that he would take care of the problem in a few months. Ms. Hall never brought the issue up with Mr. Dunham himself.
 
 
 6
 Neither did Ms. Hall bring the scheme to the attention of any other directors of the insured. In her role as secretary to the board of directors, Ms. Hall helped to prepare monthly reports for the board. Whereas the cash items figure for the month's end report was computer-generated, Ms. Hall had personal responsibility to account for all overdrafts in excess of one hundred dollars as of the last business day of each month. She verified the report for her supervisor, Barbara Rice, and prepared the minutes for and attended each board meeting. Ms. Hall testified that it was never her intent to defraud the insured and cause it to sustain a loss by not reporting Mr. Dunham's scheme to the directors. She felt that because she had already spoken to her superiors, Mr. Floyd and Ms. Rice, she need not have done anything further. At one point, however, the bank's president told her that if the scheme ever failed, he probably would end up in prison.
 
 
 7
 Ms. Rice, another cousin to Mr. Dunham, was the senior vice-president of Adair and manager of a branch office. As the bank's internal control officer, she was responsible for reviewing the insured's reports on cash items and overdrafts. She first noticed the check-kiting scheme in the summer of 1985, when she questioned Ms. Hall about a high balance in cash items. The secretary reported that the cash items were in fact Mr. Dunham's bad checks, and that she understood that Mr. Dunham was getting a large loan to remove those items. Though the items were removed at the end of that month, Ms. Rice noticed that the cash items returned to an inordinately high figure shortly afterward. Ms. Rice finally confronted the bank's president, Charles Floyd, about the checks, and he assured her that Mr. Dunham was obtaining a loan to take care of the matter. Ms. Rice knew that such a practice was against the bank's procedures and the law. After several conversations with the bank's president, and after watching the amount reported in cash items increase every month, the senior vice president spoke to Mr. Dunham when he visited the bank's branch office. He promised that the matter would be taken care of at the end of the month and requested that she not "pull the plug." (Record, Vol. 1, Doc. 78, Ex. Q at 37.) Ms. Rice testified that because she was wary of the relationships among the chairman of the board and the other directors, she did not bring up the scheme to any of the board members. She had reported defalcations of an earlier bank president to one of the bank's directors, a man who was on the board during all time periods relevant here. Ms. Rice testified that she worried about her relatives inside and outside of the bank and about the effect on the family name if her cousin were exposed. However, she apparently spoke openly with persons outside of the bank concerning Mr. Dunham's overdrafts. Ms. Rice also discussed Mr. Dunham's overdrafts with fellow Adair officers Randy Abbott and Marilyn Palmer.
 
 
 8
 On the eve of the FDIC's discovery of the scheme in March 1986, Ms. Rice sold a block of the bank's stock. She did not tell the buyer about Mr. Dunham's bad checks or the extent of the bank's losses. She sold the stock at just under its quoted price. Shortly afterward, when the scheme was discovered, the stock's value plummeted.
 
 
 9
 Charles Floyd, president of the insured and Mr. Dunham's half-brother, discovered the scheme no later than September 1985, when he noticed a high amount in cash items. He spoke with Ms. Hall about the figure, and she revealed that the items were Mr. Dunham's checks. The bank president had contacted Mr. Dunham on prior occasions when he noticed that Mr. Dunham was writing checks for which an insufficient fund report had been generated. Mr. Dunham had directed that the checks be placed in cash items and said that he would cover them. Mr. Floyd had written "hold" on many of the overdrafts to authorize their status as cash items. It apparently became common practice at the bank to report the overdrafts of the chairman under the cash items account. Mr. Floyd testified that until his conversation with Ms. Hall about the unexpectedly high amount in cash items in September 1985, he had assumed that Mr. Dunham was taking care of the bad checks.
 
 
 10
 When Mr. Floyd learned in September 1985 that Mr. Dunham was not covering his bad checks, he called Mr. Dunham and demanded an explanation. Mr. Dunham advised the bank's president that he was attempting to get a loan to cover the checks. He also threatened that if Mr. Floyd did not keep quiet, he would ruin him financially. Mr. Floyd complied, at least for some time; he did not speak to any of the directors about the chairman's scheme. He did, however, send to the insured's co-owner and director, George Ramey, the insured's daily statement of conditions report for the fifteenth of each month, which reflected the large amount in cash items. He did not speak directly with Mr. Ramey about Mr. Dunham's scheme. Moreover, in July 1985 he reminded his half-brother about the impending arrival of an outside auditor so that the latter could remove his overdrafts from the cash items account at Adair.
 
 
 11
 Mr. Floyd worked only part-time at the insured during the fall of 1985 due to illness, and he left completely that winter for surgery, returning in early 1986. During his absence, he contacted a former white-collar crime investigator of the Oklahoma Bureau of Investigation concerning Mr. Dunham's scheme. The investigator advised Mr. Floyd to make an anonymous phone call to the Oklahoma Banking Commission. Mr. Floyd called the commission and indicated that it should investigate the insured, but he did not give any specifics of Mr. Dunham's scheme. The commission did conduct an examination of the bank and discover the high number of cash items. But the examiners did not inquire further.
 
 
 12
 Upon Mr. Floyd's return to Adair, he discovered that Mr. Dunham's overdrafts had reached $500,000. Mr. Floyd testified that when he confronted Mr. Dunham, the latter threatened him with financial ruin and loss of his income and livelihood if he exposed the fraudulent transactions. Mr. Floyd then sought the advice of an attorney, who counseled him to report the check-kiting scheme to the authorities. The bank president, however, did not immediately report Mr. Dunham's scheme. He instead sought new employment at three banks, telling each that he wanted to get away from illegal acts which were occurring at Adair and in which he took no part.
 
 
 13
 Mr. Dunham's scheme ended on March 28, 1986, when the FDIC performed an examination at the Bank of Chelsea and discovered a check drawn by Mr. Dunham on his Adair account. The check was being held as a cash item at Chelsea. Mr. Dunham confessed his scheme that day, but only after he and Mr. Floyd made one last attempt to cover up the scheme. When informed of the examiner's discovery, the chairman wrote a check from his Adair account to cover the check at the Bank of Chelsea. When the examiner asked Mr. Floyd whether the check was good, the bank's president lied and said that it was. He then borrowed money to cover the check personally and deposited it in Mr. Dunham's account. The bank's chairman nevertheless broke down and revealed to the examiners his entire scheme. The examiners discovered $569,000 in checks drawn on Mr. Dunham's Adair account which were being held at Adair in cash items.
 
 
 14
 Adair State Bank had purchased from American Casualty a Bankers Blanket Bond and an Excess Bank Employee Dishonesty Blanket Bond. The insured sought indemnity under the fidelity bonds issued by American Casualty for the loss incurred as a result of Mr. Dunham's scheme in a letter from Mr. Floyd dated March 28, 1986. The insurer denied coverage on September 19, 1986. The insurer rejected the claim on the grounds that coverage of Mr. Dunham's activities terminated with the initial discovery of the loss by the insured's officers Floyd, Hall, and Rice in the summer and fall of 1985. The insurer asserted that after this discovery the insured failed to give timely notice of its loss, which is a condition precedent to coverage under the policy.
 
 
 15
 The insured brought suit in state court to recover under the bonds its losses sustained by Mr. Dunham's check-kiting scheme. The insured also sued for breach of duty of good faith and fair dealing. The insurer removed the case to the United States District Court for the Northern District of Oklahoma. The insurer filed a motion for summary judgment that raised policy defenses to coverage under the bonds and disputed the insured's allegation of bad faith. The district court granted summary judgment in favor of the insurer on the insured's claim of bad faith. It denied the insurer's motion on the policy coverage, and the suit for recovery on the insurance contracts was tried to the district court on stipulated facts. The district court found that the defalcations of Mr. Dunham were covered under the fidelity bonds and entered judgment in favor of the insured on its claim of breach of contract. The insurer appeals the judgment of the district court that it breached its contract with the insured. The insured cross-appeals the district court's summary judgment in favor of the insurer on its allegation of bad faith. Finally, the insurer contests the district court's award of attorney fees to the insured.
 
 II.
 
 16
 Interpretation of terms contained in an insurance contract are issues of law which we review de novo. See In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir.1988). When a case is submitted to the district court on stipulated facts, "the ordinary standard of review still inheres: findings of the trial court are set aside only if they are clearly erroneous." Sears v. Atchison, Topeka & Santa Fe Ry. Co., 645 F.2d 1365, 1370 (10th Cir.1981) (citation omitted), cert. denied, 456 U.S. 964, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982). We look to Oklahoma law to aid our interpretation of the fidelity bonds. Rhody v. State Farm Mut. Ins. Co., 771 F.2d 1416, 1420 (10th Cir.1985). Because the bond in question is required by statute, we review the bond in light of the statute and read its terms into the bond. Lum v. Lee Way Motor Freight, Inc., 757 P.2d 810, 816 n. 22 (Okla.1987). The Oklahoma provision, which the terms of the bond closely mirror, requires:
 
 
 17
 The directors of a bank or trust company shall require good and sufficient fidelity bonds on all active officers and employees ... which bonds shall provide for indemnity to such bank or trust company on account of any losses sustained by it as the result of any dishonest, fraudulent or criminal conduct by them acting independently or in collusion or combination with any person or persons.
 
 
 18
 Okla.Stat.Ann. tit. 6, § 713 (West 1984).
 
 
 19
 Pursuant to the Oklahoma provision, the banker's blanket bond provides indemnity against losses caused by the dishonest or fraudulent acts of bank employees up to $300,000, with a $10,000 deductible, and an excess bond provides coverage over that amount up to $1,000,000. Both bonds afford coverage for "[l]oss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others," subject to specified terms, conditions, limitations, and exclusions. (Record, Vol. 1, Doc. 78, Ex. G.) The bonds further define coverage of an employee's "dishonest or fraudulent acts":
 
 
 20
 only dishonest or fraudulent acts committed by such Employee with the manifest intent (a) to cause the Insured to sustain such loss, and (b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit.
 
 
 21
 Id. The parties do not disagree that Mr. Dunham committed a dishonest or fraudulent act with the manifest intent to cause the insured to sustain a loss and to obtain financial benefit for himself. At issue are the actions of officers Floyd, Rice, and Hall.
 
 
 22
 Before we begin our analysis of the insured's claim for breach of contract, we emphasize that the district court couched in the alternative its judgment that the insured's loss was covered under the fidelity bonds. The district court held that because the other officers were in collusion with Mr. Dunham, their discovery would not be imputed to the insured for purposes of the bond's requirement that the insured give notice to the insurer within thirty days of its discovering the loss. In the alternative, the district court held that officers Dunham, Floyd, Rice, and Hall all committed independent acts which were dishonest or fraudulent and combined to produce the loss. We need only affirm the district court on one of the two conclusions to affirm its decision. We first address the policy defenses asserted by the insurer.
 
 A.
 
 23
 Coverage under both bonds is conditioned on timely notice. The bonds require the insured to give notice "[a]t the earliest practicable moment, not to exceed 30 days, after discovery of [the] loss." (Record, Vol. 1, Doc. 78, Ex. G.) The bond further states:Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.
 
 
 24
 Id. The insured provided notice to the insurer on March 28, 1986. The insurer argues that the insured discovered the loss more than thirty days prior to that date. If, as the insurer alleges, the insured did discover its loss prior to that time, then the insured failed to comply with a condition precedent for coverage, and liability under the fidelity bonds would not accrue. See Fidelity & Deposit Co. v. United States Fidelity & Guar. Co., 179 Okl. 174, 64 P.2d 672, 674-75 (1935).
 
 
 25
 At issue under this provision is whether the knowledge of officers Floyd, Rice, and Hall may be imputed to the insured. The district court concluded, and neither party disagrees, that the officers' knowledge is imputed to the bank unless they participated in the wrongdoing that caused the loss. See Alfalfa Elec. Coop., Inc. v. Travelers Indem. Co., 376 F.Supp. 901, 907 (W.D.Okla.1973). We focus on whether the action or inaction of the officers at issue is sufficient to characterize them as "participants" in Mr. Dunham's scheme.
 
 
 26
 We initially examine the actions of Mr. Floyd, the president of the bank. As the insured makes clear, Mr. Floyd's action included honoring checks for which there were insufficient funds and complying with his half-brother's request to place overdrafts on his account in cash items. Mr. Floyd's "participation" was essential for Mr. Dunham's scheme to work. See First Nat'l Bank v. Fidelity and Casualty Co., 634 F.2d 1000 (5th Cir.1981) (allegation of conspiracy to defraud through a forgery and check-kiting scheme perpetrated by director and "facilitated" by bank president, if true, asserts claim under employee fidelity bond); cf. Federal Deposit Ins. Corp. v. National Sur. Corp., 281 N.W.2d 816 (Iowa 1979) (bank president whose conduct included holding overdrafts as cash items committed dishonest and fraudulent acts); National Newark and Essex Bank v. American Ins. Co., 76 N.J. 64, 385 A.2d 1216 (1978) (repeated approval of unauthorized loans so that customer could cover overdrafts was dishonest and fraudulent). Mr. Floyd's anonymous request for an investigation of the bank does not mitigate his participation--he only attempted to escape blame by such action when it was clear that the overdrafts would eventually be discovered. Moreover, Mr. Floyd attempted to conceal Mr. Dunham's dishonesty until the very end, when he borrowed money to place in Mr. Dunham's account so that investigators would not uncover the check-kiting scheme.[2] Mr. Floyd clearly put the interest of his half-brother above those of his employer.
 
 
 27
 This court cannot ignore the action, and at times inaction, of Ms. Rice. Without aid from the person responsible for the insured's internal control, Mr. Dunham's scheme would have failed. Ms. Rice was directly responsible for overseeing the operation of the bank so that schemes like Mr. Dunham's would not occur. In fact, she had reported the defalcation of a prior president of the bank to a director before Mr. Dunham and his partner acquired a controlling interest in the insured. Yet in this case, Ms. Rice submitted to the board of directors reports which she knew hid damning facts of what had transpired during the preceding month. Courts in other circuits have found similar behavior to be dishonest and fraudulent. Federal Deposit Ins. Corp. v. Aetna Casualty and Sur. Co., 426 F.2d 729, 737 (5th Cir.1970) ("[B]oth misrepresentation and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct.") (citations omitted); Citizens State Bank v. Transamerica Ins. Co., 452 F.2d 199, 203 (7th Cir.1971) (same). Even when it was clear that her cousin could not pay the overdrafts and it was only a matter of time before the scheme would be discovered, she sold her shares in the insured rather than report Mr. Dunham's fraudulent actions. She kept her word and did not "pull the plug" on Mr. Dunham, and in doing so she breached a duty she owed to the bank. We believe Ms. Rice's conduct sufficiently constituted "participation" in the scheme to preclude her knowledge from being imputed to the bank under Oklahoma law. She believed that it was in her best interest to conceal from her employer information which adversely affected its well-being. The doctrine of imputation therefore does not apply. See Puget Sound Nat'l Bank v. St. Paul Fire and Marine Ins. Co., 32 Wash.App. 32, 645 P.2d 1122, 1127 (1982) (examining imputation doctrine and agency rules).
 
 
 28
 Ms. Hall's behavior, as the insured's secretary and cashier, is very troubling. As the insurer points out, she had no conversation with Mr. Dunham concerning his overdrafts. She also indicated in her testimony that she had no fraudulent motive for her silence. The insurer therefore argues that, at worst, Ms. Hall's actions constituted negligence with no motive to participate in the scheme. We nevertheless believe that her conduct amounted to more than gross negligence or poor judgment. The district court correctly concluded from the stipulated facts that Ms. Hall was a "participant" in Mr. Dunham's scheme. As with the assistance of Mr. Floyd and Ms. Rice, Mr. Dunham's scheme would have failed without the assistance of Ms. Hall. She was responsible for preparing reports submitted to the board of directors, and she never reported the clear abuse by Mr. Dunham.[3] She followed Mr. Floyd's directions to hold the overdrafts in cash items. This action, which violated bank policy, and her preparation of reports which failed to detail Mr. Dunham's exorbitant overdrafts, are sufficient facts to support the district court's conclusion that Ms. Hall was a participant in Mr. Dunham's scheme. Cf. National Bank of Pakistan v. Basham, 142 A.D.2d 532, 531 N.Y.S.2d 250 (1988), aff'd, 73 N.Y.2d 1000, 541 N.Y.S.2d 345, 539 N.E.2d 101 (1989) (bank employee who intentionally chose not to debit account for dishonest checks and instead debited frozen account committed dishonest or fraudulent act with manifest intent to cause employee a loss); compare Federal Deposit Ins. Corp. v. St. Paul Fire and Marine Ins. Co., 942 F.2d 1032 (6th Cir.1991), and cases cited therein (officer did not have manifest intent to cause employer injury because evidence demonstrated intent to benefit the insured).
 
 
 29
 In order for the scheme to succeed, it was necessary for each of the officers to perform certain actions and also remain silent in the face of their professional duty to report certain information to the board of directors. All three officers were repeatedly called upon to choose between the interests of the bank and the interests of Mr. Dunham. Each time, they chose to promote the welfare of Mr. Dunham to the detriment of their employer. The district court was not clearly erroneous when it concluded that officers Floyd, Hall, and Rice were participants in Mr. Dunham's check-kiting scheme. Their discovery of Mr. Dunham's dishonesty, therefore, should not be imputed to the insured. See Aetna Casualty, 426 F.2d at 739 (knowledge of defalcator "and the directors associated with him cannot be imputed to the Bank since they were acting adversely to its interests."). The proper date of discovery is therefore the date when the FDIC examiners reported Mr. Dunham's defalcations to the board of directors.
 
 B.
 
 30
 The insurer next argues that coverage for losses due to Mr. Dunham's defalcations ended once officers Floyd, Hall, and Rice knew of his dishonesty, and thus that insurer need not recompense the bank for losses subsequent to this time. The bond provision at issue states in relevant part:
 
 
 31
 This bond shall be deemed terminated or canceled as to any Employee or any partner, officer or employee of any Processor--(a) as soon as any Insured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the insured or any other person or entity.
 
 
 32
 (Record, Vol. 1, Doc. 78, Ex. G.)
 
 
 33
 The district court found that discovery of the scheme by officers Floyd, Rice, and Hall did not terminate the policy. Because the officers were in "collusion" with Mr. Dunham, the district court reasoned that the termination provision was never triggered. We address the meaning of "collusion" under the policy.
 
 
 34
 Absent a definition in the policy, we are to discern the plain and ordinary meaning of a term. Okla.Stat.Ann. tit. 15, § 160 (West 1966); Continental Oil Co. v. National Fire Ins. Co., 541 P.2d 1315, 1320 (Okla.1975). We therefore look to the meaning of "collusion" in its ordinary and popular sense, keeping in mind each clause of the contract to aid our interpretation. Okla.Stat.Ann. tit. 15, § 157 (West 1966).
 
 
 35
 The district court, searching for a popular definition of "collusion," cited the following definition from Black's Law Dictionary:
 
 
 36
 An agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose.... A secret combination, conspiracy, or concert of action between two or more persons for fraudulent or deceitful purpose.
 
 
 37
 Black's Law Dictionary 240 (5th ed. 1979) (citation omitted). The district court then concluded that officers Floyd, Hall, and Rice were aware of what each knew and what each was doing. The court concluded that they secretly participated toward the same unlawful purpose of concealing Mr. Dunham's activities.
 
 
 38
 Neither party disagrees with the district court's definition of "collusion," but the insurer takes issue with how the district court applied the term to Ms. Hall's activities. The insurer explains that when Ms. Hall learned of Mr. Dunham's dishonest and fraudulent acts, she did not have a secret agreement with him to further the scheme. It emphasizes Ms. Hall's assertion that she never spoke with Mr. Dunham concerning his overdrafts. The insurer complains that Ms. Hall remained silent not because she was a co-conspirator who intended to defraud the bank, but because she believed that she did not need to speak to anyone other than her superiors.
 
 
 39
 We do not construe Ms. Hall's silence so benignly. The district court found, and we agree, that Ms. Hall's tender to the board of directors of a month-end report which completely concealed the activities of its chairman was sufficient action to be fraudulent. Ms. Hall's silence, though perhaps understandable given her familial relationship with Mr. Dunham, is nonetheless sufficient for us to uphold the district court's finding that she was in "collusion" with the bank chairman. In reaching this decision, we also note Ms. Hall's involvement with holding the overdrafts in cash items.
 
 
 40
 The insurer next argues that the bond's coverage terminated when one of the officers first discovered Mr. Dunham's dishonest acts. At the time of discovery, the insurer contends, the officers were not in collusion with Mr. Dunham, and any subsequent collusion does not negate the termination clause. This analysis would invoke the termination clause during the window of time between discovery and the officers' decision to hide Mr. Dunham's dishonest and illegal action from the board of directors.
 
 
 41
 We reject the insurer's interpretation of the provision as inconsistent with the intent of the Oklahoma statute requiring a bank or trust to insure the fidelity of its officers and employees. Such an interpretation would effectively limit the definition of collusion to preexisting agreements to defraud the bank. For example, the bond under this interpretation would not apply to an employee who discovered a co-worker's defalcation and then used blackmail to acquire some of the illegally obtained funds. We do not believe that the Oklahoma legislature intended to immunize the insurer from liability once one dishonest employee discovers the dishonesty of another. The intent of the termination provision clearly is to encourage the insured to release dishonest employees. See Alfalfa, 376 F.Supp. at 912 ("[I]t has been held to be a breach of good faith to maintain the agent in a position of trust after discovering his defalcations without notifying the fidelity carrier and giving it an opportunity to decide whether or not it desires to continue as insurer.") (citations omitted). In this case, where the insured never had the knowledge or the opportunity to release any of the officers from its employ, the termination clause did not take effect at the time argued by the insurer.
 
 
 42
 We agree with the district court's finding that (1) the insured provided timely notice of its loss to the insurer, and (2) the termination clause was not triggered when other officers discovered Mr. Dunham's scheme. Because we agree with the district court that the policy defenses asserted by the insurer were not applicable, we need not reach the alternative holding that each officer committed a fraudulent or dishonest act with the manifest intent to cause loss to the insured.
 
 III.
 
 43
 The insured cross-appeals the district court's summary judgment on its claim alleging bad faith by the insurer. The insured finds fault with the insurer's failure to investigate the case thoroughly, alleging that the insurer failed to inquire fully into facts which might have supported coverage. The argument rests substantially on two assertions: first, that the insurer's very structure for claims management predisposes it to deny coverage, and second, that the insurer's investigation of this claim was inadequate.
 
 
 44
 We review a grant of summary judgment under the same standard as the trial court. Summary judgment may be granted only if there is no genuine issue of material fact, and all evidence must be viewed in a light most favorable to the party opposing the motion. Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988).
 
 
 45
 Oklahoma tort law recognizes "a cause of action ... against an insurer for a bad faith refusal to compensate its insured for a loss covered by the policy." Christian v. American Home Assurance Co., 577 P.2d 899, 901 (Okla.1977) (citations omitted). To prevail with a claim of bad faith refusal to compensate, the insured must show that the insurer's actions were unreasonable. Conti v. Republic Underwriters Ins. Co., 782 P.2d 1357, 1360 (Okla.1989) (insured must show unreasonableness of insurer); McCorkle v. Great Atlantic Ins. Co., 637 P.2d 583, 587 (Okla.1981) (insured has burden of proving elements of bad-faith tort). Where legitimate disputes exist regarding "matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions ... [r]esort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer." Christian, 577 P.2d at 905. Regarding the quantum of proof required, "tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured." Id. (emphasis added).
 
 
 46
 After thorough consideration of the pleadings and record before us, and viewing the evidence in the light most favorable to the insured, we conclude that the insured has not carried its burden of proving an unreasonable, bad-faith decision by the insurer not to pay a covered claim. To the contrary, it appears that a legitimate dispute existed over the terms included in the bond policy agreement which determined coverage, notably the word "collusion" and the concept of "participation." As a matter of law, then, the insurer's refusal to pay the claim was not unreasonable, and the insurer was entitled to summary judgment on the claim of bad-faith refusal to pay.[4]
 
 
 47
 As another part of its argument of bad faith, the insured emphasizes Oklahoma caselaw recognizing the insured's legitimate interest in having a claim processed promptly in order to avoid economic hardship. See Lewis v. Farmers Ins. Co., Inc., 681 P.2d 67, 69 (Okla.1983). The applicable statute in Oklahoma allows the insurer ninety days to respond to the insured after receiving a proof of loss. Okla.Stat.Ann. tit. 36, § 3629(B) (West 1990). Because in this case the insured acknowledges that the insurer formally responded to its proof of loss form within one month of receiving it, the insured's claim of unwarranted delay is without merit.
 
 
 48
 We find that summary judgment on the claim of bad-faith refusal to pay was appropriate here, because the insured failed as a matter of law to prove that the insurer acted unreasonably or in bad faith.
 
 IV.
 
 49
 Finally, the insurer appeals the award by the district court of $250,000 in attorney fees on its indemnity claim. It argues that the terms of the bonds specifically exclude attorney fees in an action to determine coverage, and that the amount of the attorney fees awarded to the insured is excessive.
 
 Oklahoma law requires that:
 
 50
 It shall be the duty of the insurer, receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to the insured within ninety (90) days of receipt of that proof of loss. Upon a judgment rendered to either party, costs and attorney fees shall be allowable to the prevailing party. For purposes of this section, the prevailing party is the insurer in those cases where judgment does not exceed written offer of settlement. In all other judgments the insured shall be the prevailing party.
 
 
 51
 Okla.Stat.Ann. tit. 36, § 3629(B) (West 1990). The insurer argues that this statute does not mandate an award, but merely grants the court discretion to award attorney fees. It also argues that the terms of the bonds themselves provide that attorney fees incurred by the insured in this action are excluded as an expense in establishing the existence of a loss covered under the bond.
 
 
 52
 We focus initially on the Oklahoma statute in which attorney fees "shall be allowable." It is clear that the term "shall" denotes an affirmative mandate by the Oklahoma legislature. The term "is a word of command or mandate, with a compulsory and peremptory meaning. It denotes exclusion of discretion and signifies an enforceable duty." Davis v. Davis, 708 P.2d 1102, 1107 n. 23 (Okla.1985). The insurer, however, focuses on the term "allowable," and argues that if the legislature wished attorney fees to be mandatory, it would have used the phrase "shall be allowed," as it has in other statutes. See, e.g., Okla.Stat.Ann. tit. 12, §§ 938-940 (West 1988). We find merit in the insurer's reasoning. Words in statutes should be understood in their ordinary sense unless a contrary intention plainly appears. See Okla.Stat.Ann. tit. 25, § 1 (West 1987). We believe that by using the term "allowable," the Oklahoma legislature intended to lodge discretion with the trial judge. The term "shall" indicates that the trial court always has discretion to award attorney fees subject to those limitations contained in the statute.
 
 
 53
 Each bond provides that the insurer will not be liable for "costs, fees, and other expenses incurred by the Insured in establishing the existence of or amount of loss covered under this bond." (Record, Vol. 1, Doc. 78, Ex. G.) The insurer argues that the attorney fees incurred by the insured in this action are excluded as expenses to establish the existence of a loss covered under the bonds.
 
 
 54
 We note initially that exclusionary clauses in insurance policies are construed narrowly under Oklahoma law. See An-Son Corp. v. Holland-America Ins. Co., 767 F.2d 700, 703 (10th Cir.1985); Conner v. Transamerica Ins. Co., 496 P.2d 770, 774 (Okla.1972). Given this limitation, we do not believe that the provision cited by the insurer serves the purpose for which it is invoked. The exclusion is directed solely to costs and fees incurred to establish either the existence of a covered loss or the amount of the loss. In this case, the existence of a loss was known when Mr. Dunham confessed his activities to the FDIC examiners. The amount of the loss was determined by tallying the total amount of the overdrafts. The insured expended attorney fees to prove the existence or extent of coverage, not the existence or extent of loss; and fees paid for this purpose lie outside of the exclusion. This interpretation of the exclusionary clause is loyal to its plain meaning. The interpretation urged by the insurer, in contrast, would provide it an incentive to litigate all claims. The insurer's interpretation would also conflict with our holding that under the Oklahoma statute, attorney fees are always within the discretion of the trial judge. Because the district court awarded attorney fees under the mistaken belief that they were mandatory, we remand the cause to the district court to award the fees in its discretion.
 
 
 55
 The insurer also contests the amount of the attorney fees awarded, a figure which rests in the discretion of the trial judge. Cf. Ramos v. Lamm, 713 F.2d 546, 556 (10th Cir.1983) (establishing guidelines for awarding attorney fees under 42 U.S.C. § 1988). The insured was represented by two law firms, one of which has as a partner George Ramey, a co-owner with Mr. Dunham of the controlling shares of stock in the insured. In a meeting of the insured's board of directors, Mr. Ramey volunteered the services of his law firm in this litigation to help reduce legal expenses. The insurer argues that because the insured has not incurred any legal fees from Mr. Ramey's law firm, it should not be entitled to recover an award for the work performed by that firm. The insured argues that when it decided to bring suit for indemnity, it entered into a contingent fee agreement providing attorney fees of one-third of recovery. The insured further argues that the services volunteered by Mr. Ramey concerned other matters and were not relevant to the litigation over indemnity.
 
 
 56
 We have before us no evidence of a contingent fee agreement between the insured and Mr. Ramey's firm. The board minutes of the insured merely contemplate such an agreement with a second firm, which also worked on this action. Absent evidence of a contingent fee agreement, we conclude that the insured incurred no legal fees for the work performed by Mr. Ramey's law firm under the Oklahoma provision. See Securities and Exchange Comm'n v. Comserv Corp., 908 F.2d 1407, 1413-16 (8th Cir.1990) ("fees are incurred when there is a legal obligation to pay them"). Unless Mr. Ramey's firm can offer proof, preferably in writing, of a contingent fee agreement between the insured and the firm, we believe it would be an abuse of discretion to award these fees on remand.[5]
 
 
 57
 The insurer also argues that the attorney fees award represented an unreasonable number of hours expended and an unreasonable hourly rate for certain attorneys. It questions the district court's downward adjustment of the attorney fees billed to the insured, claiming that the charges represent duplicate work and time expended on the insured's unsuccessful claim of bad-faith refusal to pay. We have reviewed the district court's judgment in light of our pronouncement in Ramos v. Lamm, 713 F.2d 546 (10th Cir.1983), and conclude that the district court did not abuse its discretion except for those fees awarded for work done by Mr. Ramey's law firm.
 
 
 58
 Because the district court awarded attorney fees under the belief that these fees were mandatory rather than within its discretion, and because fees for services rendered by Mr. Ramey's law firm were included within its award, the judgment of the district court awarding attorney fees is reversed. The cause is remanded for further proceedings on this matter consistent with this opinion.
 
 V.
 
 59
 The judgment of the district court in favor of the insured on its claim for breach of contract is AFFIRMED. The judgment of the district court in favor of the insurer on the insured's claim of bad faith is AFFIRMED. The judgment of the district court awarding attorney fees in the amount of $250,000 is REVERSED. The cause in Number 90-5153 is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation
 
 
 [2]
 The following Oklahoma provision was effective during the actions at issue:
 Any bank officer or employee who shall knowingly, willfully and fraudulently, for the purpose of defrauding the bank, pay out of the funds of said bank upon the check, order or draft of any individual, firm, corporation or association, which has not on deposit with such bank a sum equal to such check, order or draft, shall be personally liable to such a bank for the amount so paid and such liability shall be covered by his official bond.
 Okla.Stat.Ann. tit. 6, § 712(B) (West 1984).
 
 
 [3]
 The insurer quotes the following scenario by a commentator reflecting on the bankers blanket bond at issue:
 An insured, attempting to avoid the imputation rules, may assert that an otherwise honest employee, by failing to report the dishonesty of a fellow employee, is either in collusion with the dishonest employee or acting adversely to the insured's interest. It would seem that the motive of the nonreporting employee is the key. If the employee fails to report because he expects to blackmail the defaulting employee or demand a portion of the "loot," he would be deemed to be either in collusion with the dishonest employee or acting adversely to his employer's interest. See Restatement § 282, Comment a, Illustration 1. However, there are numerous reasons for not reporting that should not defeat imputation--e.g., intimidation by a fellow-employee or superior, or simply the agent's negligent failure to appreciate the significance of known facts. Certainly, the mere failure to report another employee's dishonesty without more would not constitute "collusion."
 Paul D. Schoonover, Discovery, Notice and Automatic Cancellation Under Revised Form 24, 16 Forum 962, 977 n. 63 (1981).
 Even if we were to interpret the discovery clause in the manner urged by this commentator, we would find Ms. Hall in a much different role from the employee in the hypothetical. Unlike the employee who happened on the dishonesty of another employee and failed to report it, Ms. Hall had the job of reporting such a defalcation, and her discovery occurred while she was performing this job. She was not acting as an impartial observer who failed to report dishonesty out of negligence or fear. Rather, she willingly engaged in a scheme which could only have resulted adversely to her employer's interest.
 
 
 [4]
 While the facts of this case suggest that the insurer's claims management structure may be problematic and that this particular investigation of a claim may have been less than adequate, the facts as pleaded do not make out a case of bad-faith refusal to pay a claim
 
 
 [5]
 Effective July 1, 1988, a contingent fee agreement in Oklahoma "shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated." Okla.Stat.Ann. tit. 5, ch. 1, App. 3-A (West 1992 Supp.)