Allen, J.
 

 Did Fraunhofer and Haas occupy the positions of managing director and vice president, respectively? It is conceded that they -performed the duties of those two positions, hut the Court of Appeals held that Fraunhofer and Haas were not occupying the offices named at the time the several acts of dishonesty charged to them were committed.
 

 To decide this question we must consider the facts of the record, which are as follows:
 

 Early in 1920 the Ohio Export
 
 &
 
 Trading Company entered into a contract with H. V. Fraunhofer, under which he was made the exclusive agent of the company to sell its capital stock; he also was elected vice president and general manager, and was given general supervision of the company’s activities, hiring the employes, defining their duties, and giving them their instructions, and performing all the duties usually incident to the office of
 
 *28
 
 vice president and general manager. Later lie assumed the title of managing director, and under that title continued his control of the activities of the company so long as the company was in existence. This assumption of the name of managing director was made with the knowledge and tacit consent of the board, for Fraunhofer signed letters of the company, contracts, and instruments, and also company checks, as managing director. The board of directors did not at that time adopt any resolution changing the name of the office, but the minutes of the directors’ meetings refer to Fraunhofer in several places as managing director. Later at a stockholders’ meeting, held upon March 29, 1921, the regulations of the company were amended and the title was changed from general manager to managing director. Fraunhofer performed the same functions after the change in the company regulations as he had performed before.
 

 When the policy was issued in November, 1920, one of the offices bonded was that of managing director, and no liability was assumed for fraud or dishonesty in the conduct of the office of general manager.
 

 With regard to A. 0. Haas, whose defalcations are claimed to make the bonding company liable under the clause in the bond in which it assumed liability for dishonesty or fraud of the second vice president, there is no record in the corporation’s minute book that Haas was ever elected second vice president. The office of second vice president at first was occupied by George Schneider, but Schneider resigned early in 1921, and after
 
 *29
 
 that time Haas performed the functions of second vice president. From February 16, 1921, on, Haas signed checks as vice president and treasurer. Some of the minutes of the meetings of the directors are signed by Haas, as vice president. Haas had a signature card at the Guardian Bank, the company depositary, which denominated him as vice president and treasurer, and in the absence of the president and vice president Haas called meetings of the board and presided at them as second vice president.
 

 In December, 1921, an investigation by accountants was begun, and after it was completed S. J. Kornhauser was appointed receiver of the company. The receiver filed a full proof of claim with the National Surety Company, requesting payment of $45,000 on the bond; this being the aggregate sum due on the bond for defalcation on the part of the managing director and on the part of the second vice president. No question is made- as to the fact that loss was incurred by the assured through the dishonesty of Fraunhofer and Haas during the period that the bond was in force and in the amount of more than $45,000.
 

 The Court of Appeals apparently took the view that as the two offices were elective and as Fraunhofer was not elected managing director, and Haas was not elected second vice president, they were not occupying the offices, respectively, of managing director and second vice president. The judges predicate this opinion upon the phrase of the bond which makes the surety liable for dishonesty by employes “occupying and performing” the duties of the positions of managing director.
 
 *30
 
 and second vice president. In other words, they held in effect that persons who actually perform the duties of specified elective offices in a corporation and have the exclusive possession and control thereof, but are not elected thereto, do not occupy those offices.
 

 The Court of Appeals also grounded its decision as to Fraunhofer partly upon the fact that no office of managing director existed in the company regulations at the time that the bond was executed.
 

 It should be borne in mind as to Fraunhofer in particular that the surety company when it wrote the bond did not bond specific persons. The bond issued was a schedule position bond in which the surety company bonded persons occupying positions named in the schedule, but did not examine into the identity of those persons. In this particular bond the surety company undertook the risk of loss for defalcation on the part of persons who occupied the positions of managing director and second vice president, no matter who those persons might be.
 

 Now at the time this bond was written there was a position of general manager in the company. The duties incident to this position were the same duties as those which Fraunhofer performed when the office of managing director was later created, duties of general supervision and control. When the surety company wrote the bond, it wrote it having in mind the specific persons who were directing the work of the company. At that time Fraunhofer was in complete control of the company’s activities, performing duties ordinarily performed by a managing director, and was called
 
 *31
 
 the managing director by the corporation. He was recognized as managing director by the corporation and by the surety company alike, and hence the contract of the surety company as to the managing director was made with Fraunhofer clearly in mind, and with the evident intention of designating Fraunhofer as the employe bonded, so long as he should continue to perform the same duties that he was performing at the time the bond was executed. For the purposes of this record the position of managing director had been practically created by the export company, and the surety company cannot avoid liability upon that ground for it had Fraunhofer in mind when it executed the contract of indemnity.
 

 As to the position of second vice president, at the time the bond was written the second vice president did exist as an officer in the association. It is true that at the time the bond was written Haas was not the second vice president. However, Schneider resigned early in 1921 and Haas assumed his functions. Now, performance of the functions of a position does not of itself alone constitute occupation of a position. It is possible, for instance, to imagine a situation in which a deputy performs all of the functions of an office, and yet does not occupy the office, because he is acting as agent and does not have possession of the office. In this instance, however, not only did Fraunhofer perform the functions of managing director, and Haas perform the functions of second vice president, during the period the bond was in force, but no one else performed, assumed to perform, or was authorized to perform, those functions. In
 
 *32
 
 other words, Fraunhofer and Haas not only performed the duties of the positions in question, hut they were in exclusive possession and control of those positions, respectively. Under these circumstances, did they “occupy” the positions?
 

 Looking to the definition of the word “occupy,” we find that it means physical possession, actual use. Thus occupancy does not necessarily include residence. Webster defines “occupancy” as the act of taking or holding possession; and defines an “occupant” as one who occupies or takes possession; one who has the actual use or possession, or is in possession, of a thing.
 
 Twiggs
 
 v.
 
 State Board of Land Com’rs., 27
 
 Utah, 241, 75 P., 729.
 

 Most of the cases which define the word “occupy” necessarily relate to questions of real property, and in those cases “occupancy” generally means actual possession of land. As commonly used and understood, the word “occupation” is synonymous with “possession.”
 
 Yost
 
 v.
 
 Anchor Fire Ins. Co.,
 
 38 Pa. Super. Ct., 594. However, the word “occupation” also has the connotation of use for the purposes germane to the property.
 
 Trustees of Phillips Academy
 
 v.
 
 Inhabitants of Andover,
 
 175 Mass., 118, 55 N. E., 841, 48 L. R. A., 550.
 

 “Occupy” is also held to be synonymous with the word “operate.” “In the primary and most familiar sense of the word ‘occupy,’ * * * it is the equivalent of the word ‘possess.’ ” It implies the conception of permanent tenure for a period of greater or less duration, as used in a deed. In relation to the occupation of a coal bed the word “occupy” is synonymous with “work”
 
 *33
 
 or “operate.”
 
 Hoysradt
 
 v.
 
 Delaware, Lackawanna & Western Rd. Co.,
 
 (C. C.), 151 F., 321, 329, 330.
 

 It is evident that when it comes to the question of what the word “occupy” means, with regard to a position, it cannot mean physical possession of a position in the sense that it means with regard to real property, physical possession of land located in a definite spot. However, it does signify the exclusive possession and control of the position. In Fraunhofer’s case an office of managing director was created by the tacit authority of the directors. In Haas’ case the office existed under the by-laws. It is conceded that Fraunhofer and Haas had exclusive possession and control of these two offices. No one else attempted to perform any of the functions of the two positions, and they performed all of these functions with the consent of the company. So far as the physical occupation of an office is possible they even had entire physical possession of the positions named in the schedule.
 

 The bond did not insure the plaintiffs in error from loss arising from dishonesty of its officials in any “office to which they had been elected.” It insured them from loss arising from dishonesty of employes occupying, that is, having exclusive possession and control of, the positions named, and performing the duties thereof. In this case it is evident that Fraunhofer and Haas had the exclusive possession and control of these offices, performing every function incident thereto, and they therefore occupied them. To hold that election is necessary to occupation is to stretch the meaning of the word “occupy” far beyond its original significance.
 

 
 *34
 
 We are strengthened in this conclusion by the fact that this is a contract of suretyship for profit. The question arises between a company, which has paid premiums for insurance from dishonesty of persons occupying offices specified, and the company which has received the premiums; and, if the surety contract is susceptible of two constructions, that one should be adopted, if consistent with the purpose to be accomplished, which is most favorable to the beneficiary.
 
 Royal Indemnity Co.
 
 v.
 
 Northern Ohio Granite & Stone Co.,
 
 100 Ohio St., 373, 126 N. E., 405, 12 A. L. R., 378; 25 Corpus Juris, 1091;
 
 Atlanta Trust & Deposit Co.
 
 v.
 
 Laurinburg,
 
 163 F., 690, 90 C. C. A., 274;
 
 American Surety Co.
 
 v.
 
 Pauly,
 
 170 U. S., 133, 18 S. Ct., 552, 42 L. Ed., 997.
 

 We think that our holding, that the dishonesty of Fraunhofer and Haas was dishonesty which occurred while they were occupying and performing the duties of second vice president and managing director, is a construction which carries out the presumed intention of the parties, as expressed in the bond, and does not extend the contract beyond the fair scope of its terms. In this connection we are cited to
 
 Livingston & Taft, Trustees,
 
 v.
 
 Fidelity & Deposit Co.,
 
 76 Ohio St., 253, 81 N. E., 330, which the surety company claims is an authority in its favor. In that case the loss insured against was such as might be sustained by reason of the fraud or dishonesty of an employe “in connection with his duties as specified on said schedule amounting to embezzlement or larceny.” Another feature of the bond was as follows (page 258 [81 N. E., 331]):
 

 
 *35
 
 ■ “And the company shall not be liable for other than the personal acts of the employe within the direct scope of his duties named in said schedule or in said notices.”
 

 In that case the bond was not a schedule bond, but named the employe, Blodt, who was secretary of the company. Blodt exceeded the duties authorized to be performed by the secretary by depositing money and' making loans. The court held, page 268 (81 N. E., 334), that:
 

 “The frauds upon the company to which these transactions were incidents, were not, therefore, the frauds of Blodt as secretary, but were acts which, by the gross negligence of the company, he was permitted to do foreign to the duties enjoined upon him by the schedule as well as the statute and the by-laws of the company.”
 

 The court decided that the surety company was not liable upon this bond, saying that “ Blodt’s frauds do not come within the direct scope of his duties as secretary, and that, therefore, they are without the obligation of the bond.”
 

 It is evident that
 
 Trustees
 
 v.
 
 Deposit Company, supra,
 
 is not an authority upon the facts herein presented, for the bond specified circumstances under which liability should arise, quite different from those specified herein, limiting liability to cases of fraud or dishonesty of the employe in connection with his duties as specified in the schedule, and emphasizing this limitation by reiterating that the company should be liable for no other than the personal acts of the employe within the direct scope of his duties named. In the bond in that case, therefore, there was a precise limitation
 
 *36
 
 of the liability of the bonding company, which does not exist in the present case.
 

 There is no doubt whatever under this record that Fraunhofer and Haas were occupying and performing the duties of managing director and second vice president at the time that the several acts of dishonesty charged to them were committed, and hence the fair construction of the contract holds the surety liable so far as this phase of the case is concerned.
 

 Turning next to consider the question of notice, we find that Section 7 of the bond provided, in part, as follows:
 

 “Upon the employer becoming aware of any evidence of dishonesty of any employe, the employer shall at the earliest practicable moment, and in any event not later than five (5) days thereafter, give written notice thereof addressed to the surety at its home office.”
 

 The court of common pleas held, and the defendant in error claims, that notice was not given in compliance with this section of the bond, and hence the surety company cannot be held liable.
 

 We agree in this particular with the defendant in error. This record contains numerous instances of dishonesty upon the part of Fraunhofer and Haas. In one of the transactions worthless china was imported by the Ohio Export & Trading Company, and Fraunhofer pretended that the company had sold this china at a profit to another company, which he and Haas had organized. Fraunhofer and Haas pretended that they had purchased and imported hundreds of valuable paintings. When these paintings arrived, they turned out to be worthless.
 
 *37
 
 Dividends were declared out of capital. By the report of certified accountants, at the time of the payment of the last dividend the company was losing about $30,000 a month, and any one who had looked into the company’s books would have seen these facts.
 

 Were these facts known to officers of the company? George Schneider, vice president and direct- or of the company, resigned, because, he said, the picture deal was “too deep for him.” Carl W. Mader, director and assistant secretary and treasurer, testified that he knew the picture deal was crooked, as follows:
 

 “Q. While you were connected with the company, did you see anything about the conduct of it that was irregular? A. I didn’t learn of anything crooked until in June of 1921, that I could say was crooked.
 

 “Q. And what was that? A. That was the picture deal.”
 

 Ralph Dorner, auditor and assistant treasurer of the company, was requested by Fraunhofer to enter an item of $2,000,000 upon the books of the company as an asset. Dorner refused to do this, and thereupon the books were removed to New York. Fraunhofer said to Dorner, when Dorner refused to enter the item upon the books, that they would “transfer the books to New York and see that the amount is set up.”
 

 The knowledge of the directors and officials was the knowledge of the corporation.
 
 Orme & Okey, Recrs.,
 
 v.
 
 Baker,
 
 74 Ohio St., 337, 78 N. E., 439, 113 Am. St. Rep., 968; First
 
 Natl. Bank of New Bremen
 
 v.
 
 Burns, 88
 
 Ohio St., 434, 103 N. E., 93,
 
 *38
 
 49 L. R. A., (N. S.), 764;
 
 London & Lancashire Indemnity Co.
 
 v.
 
 Fairbanks Steam Shovel Co.,
 
 112 Ohio St., 136, 147 N. E., 329. It is true that Schneider resigned almost immediately, within two days, in fact, of the time that he had notice of the picture deal and of crookedness in the conduct of his office by Fraunhofer. It may be questioned whether the knowledge of a director, who immediately severs his connection with the corporation, can be imputed to the corporation, the doctrine that the knowledge of directors and officers is the knowledge of the corporation being necessarily predicated upon their association with the corporation after receiving individual notice. Mader, however, remained a director after June,. 1921, when he received notice of this crookedness, until the investigations took place in December, and the corporation cannot rid itself of the fact that notice to him was notice to the company.
 

 The plaintiff in error in this connection quotes the case of
 
 McShane & Rodgers, Ex’rs.,
 
 v.
 
 Howard Bank,
 
 73 Md., 135, 20 A., 776, 10 L. R. A., 552, which holds:
 

 “The failure by the directors of the bank to give notice of the dishonesty of the cashier, if the same were known to them, to the sureties on his bond, and his retention in office, did not release the sureties, the failure of one officer of a corporation to discharge his duty not releasing the sureties of another from responsibility for the defaults of the latter.”
 

 A careful reading of that case, however, fails to indicate that the bond in question provided that the liability should not accrue if the directors of
 
 *39
 
 the hank failed to give notice of the dishonesty of the cashier, if the same were known to them within a specified period of time, or at all. Hence the bond in question is quite dissimilar from that which we are here construing, and the holding of that case does not apply.
 

 Notice was not given of fraud and dishonesty upon the part of Fraunhofer and Haas until December, 1921. It is conceded that this dishonesty occurred several months before that time, and at least one director of the company had knowledge thereof, and remained a director for a considerable period after that time. In view of that fact, notice was not given in accordance with the terms of the bond, and judgment must therefore be affirmed.
 

 Judgment affirmed.
 

 Marshall, C. J., Day, Kinkade and Robinson, JJ., concur.
 

 Jones and Matthias, JJ., concur in proposition 3 of the syllabus, and in the judgment.