**FIRST BANK OF MARIETTA,**
Plaintiff,

v.

**HARTFORD UNDERWRITERS INSURANCE CO., Defendant and Third–Party Plaintiff,**

v.

**Jerry Biehl, Third–Party Defendant.**

No. C2–95–466.

United States District Court,
S.D. Ohio,
Eastern Division.

Oct. 12, 2000.

Mark Stephen Miller, Columbus, OH, James Anthony Giles, Mt Vernon, OH, for Plaintiffs.

William Hunt Woods, John Joseph Petro, Columbus, OH, Dennis Lyle Sipe, Marietta, OH, for Defendant.

### OPINION AND ORDER

MARBLEY, District Judge.

This matter is before the Court on the Defendant's Motion for Sanctions. On May 8, 2000, this Court held a sanctions hearing to determine whether the Plaintiff's suit was filed in bad faith and without a colorable basis. For the following reasons, this Court finds that sanctions are appropriate under its inherent power and therefore **GRANTS** Hartford's Motion.

### I. PROCEDURAL HISTORY

On May 8, 1995, First Bank of Marietta ("First Bank") filed suit against Hartford Underwriters Insurance ("Hartford") alleging two claims: (1) that Jerry Biehl, First Bank's Executive Vice–President and Chief Executive Officer, embezzled $87,974.44 by creating fictitious loans for his own benefit; and (2) that Mr. Biehl intentionally increased the line of credit for Mascrete, Inc. causing First Bank to suffer a loss and to financially benefit Mascrete. On May 28, 1996, Hartford moved for summary judgment on Count II of the Complaint. On March 6, 1998, this Court granted summary judgment to Hartford on Count II. *See First Bank of Marietta v. Hartford Underwriters Mut. Ins. Co.*, 997 F.Supp. 934, 937 (S.D.Ohio 1998). Final judgment was entered on September 29, 1998. First Bank appealed this Court's decision and Hartford filed for sanctions on October 20, 1998. First Bank filed its response to Hartford's motion for sanctions on November 12, 1998.

The Court of Appeals affirmed this Court's summary judgment opinion on dif-

ferent grounds. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, No. 98–4284, 1999 WL 1021852, 1999 U.S.App. LEXIS 29273 (6th Cir. Nov. 3, 1999). The Sixth Circuit found that this Court improperly considered the affidavit of Patrick Tonti in reaching its decision and held that without the Tonti affidavit, that there were no genuine issues of material fact present. Based on this reasoning, the Sixth Circuit affirmed the granting of summary judgment to Hartford on Count II.[1]

This Court heard Hartford's October 20, 1998 Motion for Sanctions on March 24, 2000. During the March 24, 2000 hearing, this Court sought to determine: (1) whether Hartford had a right to seek sanctions for "frivolous conduct" under Ohio Revised Code section 2323.51, and (2) whether Hartford satisfied the requirements of Federal Rule of Civil Procedure 11(c)(1)(A). Before the hearing, on March 23, 2000, Hartford filed a Supplemental Memorandum requesting sanctions under Federal Rule of Civil Procedure 37(a)(2)(4), and under this Court's inherent power. Following the hearing, this Court found that: (1) section 2323.51 was inapplicable; (2) Hartford did not follow the procedural prerequisites for invoking sanctions under Federal Rule of Civil Procedure 11, and that (3) this Court has inherent power to impose sanctions in this matter.

Based on these findings the Court set a second hearing for May 8, 2000, to determine whether First Bank filed its claim in bad faith and without a colorable basis. First Bank submitted a Motion for Leave to File Post Trial Brief on May 15, 2000, which this Court granted. First Bank filed its post-trial brief on May 30, 2000 and Hartford submitted its on June 9, 2000.[2] This matter is now before the

---

1. On October 20, 1998, a Satisfaction of Judgment was entered on Count I in the amount of $35,278.83 and judgment was entered in favor of First Bank.

2. On June 21, 2000, First Bank filed a Motion for Sanctions arguing that Hartford's original motion for sanctions, filed on October 20, 1998, was in bad faith. Having decided that Hartford's Motion for Sanctions should be granted, this Court **DENIES** First Bank's Motion for sanctions based on Hartford's October 20 motion.

Court to determine whether sanctions are appropriate on the basis of First Bank having filed its claim in bad faith and without a colorable basis.

## II. FACTS

### A. The Bond

First Bank purchased a fidelity bond from Hartford, the terms of which are governed by the language of the Bond Insuring Agreement ("Bond Agreement"). Among other things, the Bond Agreement provides that Hartford will indemnify First Bank for losses resulting directly from certain "dishonest or fraudulent acts" committed by employees.

The terms of the policy Hartford issued First Bank provide that Hartford would indemnify First Bank for:

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain loss, and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

As used throughout the Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

The Bond Agreement also provides for the items not covered.

EXCLUSIONS

Section 2. This bond does not cover

. . .

(e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, . . . whether such Loan, transaction or extension was procured in good faith or through trick artifice, fraud or false pretenses, except when covered under the Insuring Agreement (A), (D) or (E); . . .

Finally, the Bond Agreement provides for what constitutes "discovery" of loss and for when the Insured should notify Hartford of its loss:

DISCOVERY.

Section 3. This bond applies to loss discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

NOTICE/PROOF—LEGAL PROCEEDINGS AGAINST UNDERWRITER

Section 5.

(a) At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall given the Underwriter notice thereof.

(b) Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars. 

(d) Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss.

## B. The Events Leading Up to First Bank's Claims

Mr. Jerry Biehl was employed by First Bank as the Executive Vice President and Chief Executive Officer during the relevant period. Mr. Biehl was vested with the authority to execute the policies of the Bank as adopted by the Board of Directors. His lending authority was $100,-000, while amounts in excess of $100,000 required the approval of First Bank's Credit Committee.

At the sanction hearing, held on May 8, 2000, Mr. Tom Tonti testified as a member of the Board of Directors of First Bank of Marietta.[3] At that time, the members of the Board of Directors were Mr. Carson, Mr. Millhone, Mr. Giles, Mr. Patrick Tonti and Mr. Tom Tonti. Mr. Tom Tonti testified that it was during the May 24, 1994 Board of Directors meeting that the Directors first became aware of Mr. Biehl's activities, including the loan to Mascrete made in excess of his lending authority.[4] Mr. Patrick Tonti referenced this May 1994 Board of Directors meeting in paragraph two of his affidavit:

On May 25, 1994, during the meeting of the Board of Directors of First Bank, at which it was disclosed to the Board that Jerry Biehl had made a loan to Mascrete that was over the limits of his lending authority and in violation of bank policy, I had a private discussion with Biehl concerning the Mascrete $301,500.00 line of credit and during that discussion Biehl acknowledged to me that he knew the loan was over the limits of the lending authority. I asked Jerry why he would do such a thing and he responded that at the time he made the loan he was angry at me and the bank for not receiving his bonuses and

he wanted to get back at the bank and myself.

Mr. Tom Tonti indicated that it was not until June or July of 1994 that Mr. Patrick Tonti revealed to him that Mr. Biehl indicated that he had approved the Mascrete line of credit with the express purpose of harming First Bank. Mr. Tom Tonti testified that his father individually informed the other board members about Mr. Biehl's comment. Mr. Tom Tonti indicated that the other board members were notified "sometime in 1994," and most likely at "the end of '94." Mr. Tom Tonti's discussions with Mr. Giles concerning Biehl's remark "were not discussions as a board member, you know, on that issue."[5] Mr. Tom Tonti was asked whether Mr. Giles knew about the Biehl conversation:

Q: So Mr. Giles is the only board member that you didn't talk with to confirm that your father had told them about the private Biehl conversation before the end of 1994; is that correct?

A: To the best of my recollection, you know—again, I can't be exact on the date. But generally, you know, yes, we new that Jerry Biehl had said that to my father.

The next Board meeting was held on June 29, 1994. At this time, the board members, including Mr. Tom Tonti, were made aware of the two fraudulent loans Mr. Biehl made to the Ohio Beta Rho Alumni Association and Keith Atkins.

Also at the June 29, 1994 board meeting, Mr. Patrick Tonti and Mr. Shind were designated to notify Hartford of the loss sustained by First Bank as a result of Mr. Biehl's activities. On July 12, 1994, First Bank sent a letter to Hartford in which it

---

3. Mr. Patrick Tonti is Mr. Tom Tonti's father. The affidavit used by First Bank in its Response to Hartford's Motion for Summary Judgment was that of Mr. Patrick Tonti.

Mr. Patrick Tonti was not present at the May 8, 2000 sanction hearing. Instead, all of the testimony provided by First Bank was through Mr. Tom Tonti.

4. Mr. Tom Tonti indicated that the Mascrete line of credit was not collateralized as it should have been and that the liens were not perfected. Following First Bank's discovery of the "bad loans" made by Mr. Biehl, First Bank rewrote the loan to perfect its security interests.

5. Mr. Giles was at that time and is presently First Bank's counsel.

claimed two separate losses. The first claim, in the amount of $88,000, was an embezzlement loss resulting from Mr. Biehl's conduct. The second claim was based on several loans made by Mr. Biehl in excess of his $100,000 lending limit.

In response, a Hartford representative wrote First Bank a letter, dated July 29, 1994, indicating that "an officer exceeding his lending authority does not necessarily constitute a covered loss." In the same letter, Hartford requested that First Bank provide documentation to support its claim that losses from Mr. Biehl's unauthorized loans would be part of First Bank's fidelity coverage.

On August 24, 1994, Mr. Dennis Powers, a bond claims consultant at Hartford Fidelity and Bond Company went to Marietta, Ohio to investigate First Bank's claims. Mr. Powers testified that, during his visit, he had a lengthy conversation with Mr. Patrick Tonti about the meaning of the phrase "manifest intent." Mr. Powers testified that the words meant "obvious, self-evident, indisputable." He recalled that during this approximately two-hour conversation concerning the meaning of "manifest intent," Mr. Patrick Tonti did not mention the private meeting he had with Mr. Biehl on May 24, 1994, nor did Mr. Patrick Tonti tell him that Mr. Biehl revealed that he made the Mascrete loan because he wanted First Bank to suffer a loss.

During his visit, Mr. Powers asked for documentation to show that the loans made by Mr. Biehl were dishonest. First Bank provided Mr. Powers with the Mascrete file. Upon reviewing the file, Mr. Powers concluded that it did not contain evidence of dishonesty, but that it only showed that Mr. Biehl exceeded his authority in lending to Mascrete.[6] In an interoffice memo dated August 26, 1994, Mr. Powers concluded that "I am not persuaded by anything I have reviewed in this matter that the Bank has established dishonesty or fraudulent activity on behalf of

our principal as the cause of the unauthorized loans."

Following Mr. Powers's late-August visit, Hartford sent a letter to First Bank on September 16, 1994, indicating that its first claim involving the loans to Ohio Beta Rho and Keith Adkins were valid and established. In exchange for a Release and Assignment, Hartford indicated that it would send First Bank a check in the amount of $63,000 ($88,000 minus a $25,000 deductible) to cover the loss. Addressing First Bank's second claim, Hartford indicated that "First Bank has not demonstrated that Mr. Biehl acted with a 'manifest intent' to cause a loss to First Bank; therefore, his acts do not constitute dishonesty within the meaning of the coverage." Hartford further indicated that it "would have no objection to First Bank's reserving its right as to this portion of its claim [i.e. claim two] on the bottom of the Release and Assignment if you deem it appropriate to do so." Mr. Powers testified that First Bank never provided Hartford with any information of the amount of actual loss First Banks sustained from Biehl's unauthorized lending. Specifically, First Bank never indicated a dollar amount that was lost as a result of the Mascrete line of credit.

First Bank did not respond to Hartford's September 16, 1994 letter. Mr. Tom Tonti testified that instead the Bank did some research into the meaning of the term "manifest intent," and that he personally reviewed the Mascrete loan file to determine whether "manifest intent" was present. After reviewing the file, Mr. Tom Tonti concluded that Mr. Biehl's loan to Mascrete was reckless and believed that if First Bank could show that Mr. Biehl had made the loan recklessly, then an intent to cause a loss could be inferred.

Mr. Tom Tonti recalls that Mr. Shind reported to the Board sometime between September and December of 1994 that Hartford had denied its second claim. Mr.

---

**6.** No one contests the fact that Mr. Biehl lent money without the Credit Committee's approval of an amount exceeding his lending authority.

Tom Tonti indicated that the Board of Directors for First Bank believed that Hartford's letter dated September 16, 1994, showed bad faith. The sentence Mr. Tom Tonti believes showed bad faith on behalf of Hartford is the first sentence of the third paragraph that reads: "As to the balance of First Bank's claim, it remains Hartford's position that First Bank has not demonstrated that Mr. Biehl acted with a 'manifest intent' to cause a loss to First Bank; therefore, his acts do not constitute dishonesty within the meaning of the coverage."

First Bank filed suit on May 8, 1995, alleging the same two claims it did when it filed its original proof of loss with Hartford in July of 1994. Under Count I of its Complaint, First Bank sought indemnification from Hartford for two sets of transactions made by Mr. Biehl to fictitious individuals which he then converted for his personal use. Count II was predicated on Mr. Biehl's loan to Mascrete, Inc. Mr. Biehl increased the line of credit for Mascrete to $301,500, approved advances to Mascrete bringing the loan balance to $261,981, and failed to seek the Credit Committee's prior approval before completing the transactions.[7]

### C. Alleged Frivolous Conduct

Hartford alleges that First Bank engaged in the following "frivolous conduct" in the present suit:

1. Pleading a claim based on the two fraudulent loans even though Hartford had offered to voluntarily pay those claims before the complaint was filed.

2. Pleading the Mascrete, Inc. claim even though it had failed to furnish Hartford a "proof of loss, duly sworn to, with full particulars" as required by Section 5 of the Bond.

3. Attempting to use improperly the criminal justice system to obtain false testimony from Biehl. (Biehl testified during his deposition that Tonti offered to agree that the embezzlement loss on the two fraudulent loans was less than $70,000 in exchange for Biehl's testimony that he made the loans to Mascrete, Inc. with the intent to cause First Bank to suffer a loss).

4. Failing to provide discovery by the deadlines set by the Court and providing the bulk of the documentary discovery after the discovery deadline has passed.[8]

5. Failing to produce Tonti for a deposition and failing to respond to Hartford's discovery requests for Tonti's files.

6. Responding to Hartford's motion for summary judgment with an affidavit from Tonti containing information that had not previously been revealed in discovery.

7. Presenting the Tonti affidavit that "appears to contain false statements of fact...."

### III. ANALYSIS

#### A. Inherent Power to Sanction

 A district court may award sanctions pursuant to its inherent powers when bad faith occurs. *Runfola & Assocs. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir.1996) (*citing Shimman v. International Union of Operating Eng'r, Local 18*, 744 F.2d 1226, 1229–30 (6th Cir. 1984)). A court has "[i]nherent authority to award attorney fees when a party litigates 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125

---

7. After his fraudulent acts were discovered, Biehl resigned. The Board of Directors accepted Biehl's resignation on June 7, 1994. Biehl was subsequently charged under federal law for embezzlement and conversion and entered into a plea agreement.

8. This matter will not be addressed at this time and instead will be addressed in Hartford's Motion for Sanctions pursuant to Rule 37.

F.3d 308, 313 (6th Cir.1997) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). To award attorneys' fees under the bad faith exception, "a district court must find that 'the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment.'" *Big Yank Co.*, 125 F.3d at 313 (citations omitted). The Second Circuit has held:

> In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay. *See Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir.1995); *see also Oliveri*, 803 F.2d at 1272 ("[B]ad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation").

*Schlaifer Nance & Co., Inc. v. Estate of Andy Warhol*, 194 F.3d 323, 336 (2d Cir. 1999). The Sixth Circuit is in harmony with Second Circuit precedent which recognizes the inherent power of the district court to sanction based on a finding of bad faith and the lack of a colorable basis for the suit. *See, e.g., Big Yank Corp.*, 125 F.3d at 313–14 (citing *Colombrito*, 764 F.2d at 133). Before a district court may award attorney fees, it must "[m]ake actual findings of fact that demonstrate that the claims were meritless, that counsel knew or should have known that the claims were meritless, *and* that the claims were pursued for an improper purpose." *Big Yank Co.*, 125 F.3d at 314 (citing *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1375 (6th Cir.1987)).

Under its inherent power, this Court finds that both bases upon which sanctions are appropriate are met in this case. First, there is evidence indicating that there was no "colorable basis" for Count II, the Mascrete line of credit claim. Second, there is an abundance of evidence which demonstrates that First Bank acted in bad faith not only in filing the claim, but in prosecuting it.[9]

### 1. No Colorable Basis for the Mascrete Line of Credit Claim

 "[A] claim is 'entirely without color' when it lacks any legal or factual basis." *Sierra Club v. United States Army Corps of Eng'r*, 776 F.2d 383, 390 (2d Cir.1985) (citing *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980) (per curiam)). In contrast, "[a] claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts actually had been established." *Nemeroff*, 620 F.2d at 348.

 There are several reasons for the Court's conclusion that First Bank's claim was without a colorable basis. First, since 1926, it has been well settled law in the state of Ohio that "[w]hen the employer fails to comply [with the condition precedent] he cannot recover even though the defalcation described in the bond, by employes [sic] covered by the bond, has taken place and loss has ensued." *Kornhauser v. National Sur. Co.*, 114 Ohio St. 24, 150 N.E. 921, 921 (1926) (syllabus ¶ 3); *see also Krasny v. Metropolitan Life Ins. Co.*, 143 Ohio St. 284, 54 N.E.2d 952, 956 (1944)

---

9. Before reaching the decision of whether to award sanctions for First Bank's alleged bad faith conduct, First Bank was given notice, and this Court held two hearings, on March 24, 2000 and on May 8, 2000, to preserve First Bank's due process rights. *See Ray A. Scharer & Co. v. Plabell Rubber Prod.*, 858 F.2d 317, 321 (6th Cir.1988) (holding that "[t]he district court must also afford the parties concerned in potential sanctions at least minimal procedural protections, including notice and the opportunity to respond or to be heard.") (citations omitted). The Court further permitted both parties to submit post-trial briefs.

(finding that "[c]learly, there was no compliance on the part of the plaintiff with the liberal provisions of the policy as to notice. This was a condition of the contract, the nonperformance of which precludes recovery.") (citation omitted). Here, the Bond Agreement contained a clear condition precedent to filing suit: In part, Section 5 provides:

> (a) At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall given the Underwriter notice thereof.
>
> (b) Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

First Bank was well aware of the condition precedent contained in the Bond Agreement and was in possession of the Bond Agreement which outlined these conditions.

Second, First Bank received a facsimile from Hartford dated July 1, 1994, which included a proof of loss form and outlined the ten items that were to be included with the form. First Bank responded to that request by providing its proof of loss dated July 12, 1994. After receiving First Bank's July 12 proof of loss, a Hartford representative wrote First Bank a letter, dated July 29, 1994, indicating that "an officer exceeding his lending authority does not necessarily constitute a covered loss," and requested that First Bank provide documentation to support its claim that its alleged losses from Mr. Biehl's unauthorized loans were part of First Bank's fidelity coverage.

Following Mr. Powers's August visit to First Bank, Hartford indicated in a second letter, dated September 16, 1994, that "First Bank has not demonstrated that Mr. Biehl acted with a 'manifest intent' to cause a loss to First Bank; therefore, his acts do not constitute dishonesty within the meaning of the coverage." In addition, Mr. Powers testified that First Bank never provided Hartford with any information about the amount of actual loss First Banks sustained from Biehl's unauthorized lending.[10] In its September 16 letter, Hartford concluded that First Bank had not demonstrated that its second claim fell within the Bond Agreement. First Bank never responded to Hartford's September 16, 1994 letter.

First Bank should have been aware that the suit it filed against Hartford was without legal or factual support, because it never provided information to Hartford that its second claim met the requirements of the Bond Agreement. First Bank, therefore, did not have a colorable basis to file suit.

Furthermore, First Bank had ample time to comply with the conditions precedent. Under section 3, subsection (b): "within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars." First Bank knew of its loss on May 24, 1994, and filed its claim on July 12, 1994—approximately one and a half months later. Hartford responded to First Bank's two claims by September of 1994—four months after First Bank's discovery of the loss. After learning that the proof of loss claim as filed was inadequate to support its second claim, First Bank had approximately two months to supplement its proof of loss to include Mr. Biehl's statement. Meeting these conditions precedent would have avoided litigation.[11] First Bank, however, never supplemented its claim. Rather, First Bank waited for approximately fourteen months after filing suit to submit an affidavit which purported to support the claim. At the time it filed suit, First Bank was well aware of this condition precedent and, therefore, aware of the fact that its suit was filed without a

---

10. Instead, First Bank indicated in its July 12 letter that the amount of loss was "unknown at this time."

11. Although not at issue in this sanction hearing, it bears noting that Hartford had offered to pay claim one brought by First Bank. Instead of accepting the coverage, First Bank filed suit.

legal or factual basis and therefore was without a colorable basis.

## 2. First Bank Acted in Bad Faith

▮▮▮ Typically, there are three categories of conduct that constitute bad faith: "(1) bad faith occurring during the course of the litigation; (2) bad faith in bringing an action or in causing an action to be brought; and (3) bad faith in the acts giving rise to the substantive claim." *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414, 418 (6th Cir.1992) (citing *Shimman v. International Union of Operating Eng'r, Local 18,* 744 F.2d 1226, 1230 (6th Cir.1984)). The second variety of bad faith is demonstrated by "findings that the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Smith v. Detroit Fed'n of Teachers, Local 231,* 829 F.2d 1370, 1375 (6th Cir.1987); *see also Eisemann v. Greene,* 204 F.3d 393, 396 (2d Cir.2000) (concluding that "[b]ad faith" is found where the claims brought were " '[m]otivated by improper purposes such as harassment or delay.' ") (quoting *Schlaifer,* 194 F.3d at 336).

First Bank's suit against Hartford is in the nature of bad faith in the nature of "bringing an action or in causing an action to be brought." [12] First Bank was aware of the condition precedent in the Bond Agreement, but chose to ignore it. Mr. Tom Tonti's only explanation for First Bank's conduct was that the Bank believed that Hartford was acting in "bad faith" when it stated in its September 1994 letter: "it remains Hartford's position that First Bank has not demonstrated that Mr. Biehl acted with a 'manifest intent' to cause a loss to First Bank; therefore, his acts do not constitute dishonesty within the meaning of the coverage." Mr. Tom Tonti's justification is strained at best. This Court does not find that Hartford's adherence to the plain language of the Bond Agreement manifested bad faith.

In contrast to First Bank's assertion of bad faith, Hartford provided First Bank with every opportunity to support its second claim. If the affidavit of Mr. Patrick Tonti is accepted as true, First Bank had in its possession the requisite proof to show that its second claim fell within the coverage of the Bond Agreement. With this information in its possession, First Bank had no legal or factual basis for bringing suit against Hartford. *See Kornhauser,* 150 N.E. at 925 (finding that in Ohio the "knowledge of the directors and officials [is] the knowledge of the corporation.").

The chronology was as follows. Mr. Patrick Tonti was aware of Mr. Biehl's comment to the effect that Mr. Biehl had exceeded his loan authority on the Mascrete loan to harm the Bank on May 24, 1994. The remaining board members were made aware of his comment in June or July of 1994. This suit was not filed until May of 1995, and the affidavit of Mr. Patrick Tonti was not filed until July 31, 1996. Based on this time line, provided solely through the testimony of Mr. Tom Tonti, First Bank had information in its possession *for more than two years* that would have made the second claim, arguably, a loss covered by the Bond Agreement.

Based on Mr. Tom Tonti's testimony and on Mr. Patrick Tonti's affidavit, First Bank had knowledge of Mr. Biehl's comment when it filed its original proof of loss in July of 1994. For some unknown reason, First Bank did not reveal Mr. Biehl's remark when it filed its proof of loss. With the information concerning Mr. Biehl's motivation in the hands of First Bank, the Bank would have known that litigating this matter was not necessary—at least not until *after* they presented this information to Hartford. Looking at these facts alone, First Bank's actions bespeak bad faith.

---

**12.** Bad faith that allegedly occurred during the litigation will be addressed in Hartford's Motion for Sanctions under Rule 37 of the Federal Rules of Civil Procedure. This Court does not find that there was bad faith in the acts giving rise to the substantive claim.

Finally, Mr. Patrick Tonti met with Mr. Powers on August 24, 1994. During their meeting, Mr. Powers testified that he discussed the meaning of "manifest intent" with Mr. Patrick Tonti for nearly two hours.[13] During that visit, Mr. Powers requested information that showed the loans made by Mr. Biehl were dishonest. Despite this two-hour conversation, and despite Mr. Powers request for supporting documentation, Mr. Patrick Tonti did not mention the conversation he had with Mr. Biehl on May 24, 1994.

Hartford provided First Bank with every opportunity to support its claim—including a letter outlining what should be contained in the proof of loss, and a visit by Mr. Powers who specifically asked for supporting documentation to show that Mr. Biehl's loans were dishonest. This Court could easily conclude that First Bank filed suit in an attempt to obtain payment on what it knew was an invalid claim under the terms of the Bond Agreement. This Court, however, need not reach that conclusion to find that First Bank's suit was in bad faith.

This Court concludes that First Bank's suit against Hartford is laced with bad faith and that Count II of First Bank's claim was without a colorable basis.[14]

**B. First Bank's Waiver Argument**

First Bank filed its Post–Trial Brief on May 30, 2000, and presented one new argument in its thirty-four page Brief that will be addressed.[15] First Bank argued that Hartford waived the requirement that First Bank submit a proof of loss. Hartford responded that First Bank did not provide a proof of loss with "full particulars" regarding the Mascrete Line of Credit before filing suit, and therefore, there was no waiver.

First Bank's new waiver argument misses the mark. This Court agrees with Hartford that First Bank never supplied Hartford with a proof of loss with full particulars for the second claim under the terms of the Bond Agreement. First Bank wrote a letter to Hartford dated July 12, 1994, and indicated that "the amount of loss is unknown at this time." First Bank's own admission in the July 1994 letter shows that Hartford was not provided with a proof of loss. Hartford did not "refuse[ ] to pay the amount of loss claimed," *Bartley v. National Bus. Men's Assoc.*, 143 N.E. 386 (1924), because no dollar amount was claimed.[16]

Assuming that First Bank's analysis of *Bartley* is correct in that "[t]he provision that no suit can be brought upon the policy until a certain time after loss or after acceptable proofs are furnished is thereby waived," that contention does not affect this Court's conclusion that the lawsuit was brought without a colorable basis and in bad faith. All that is "waived" is the Bond Agreement's time frame in which to bring suit. This Court is not awarding sanctions based on the length of time First Bank waited to file suit.

Finally, in its September 16, 1994 letter to First Bank, Hartford indicated that it "reserves all rights and defenses available to it under the bond and applicable law." Hartford explicitly stated that it did not waive its defenses.

**13.** Mr. Patrick Tonti was not present at the May 8, 2000 sanction hearing to refute Mr. Powers's testimony.

**14.** Bad faith has also been alleged during the course of litigation, however this will be addressed in Hartford's Motion for Sanctions pursuant to Federal Rule of Civil Procedure 37.

Furthermore, In its Post–Trial Brief, First Bank argues that abuses of discovery are not sanctionable under this Court's inherent powers. Again, this matter will be considered in a separate opinion.

**15.** First Bank also argued that the filing of an inconsistent affidavit is not sufficient to award sanctions under this Court's inherent power, and that Mr. Biehl's testimony should not be considered as he is a "liar and thief." These arguments need not be addressed as they are not the basis of this Court's award of sanctions.

**16.** Neither did Hartford deny "all liability under the policy," *Bartley*, 143 N.E. at 386, as it agreed to indemnify First Bank for its first claim.

The Court therefore finds no merit to the new argument First Bank made in its Post–Trial Brief.

### C. Attorney Fee Amount

During the May 8, 2000 sanction hearing, Hartford presented expert testimony that addressed the reasonableness of the attorney fees charged by the firm of McNamara and McNamara to Hartford. Hartford qualified Richard A. Frye as an expert on the issue of the reasonableness of Hartford's attorney fees. Mr. Frye's expert testimony was not rebutted by First Bank.

Mr. Frye testified that Mr. Woods's hourly rate of $140.00 was very low.[17] Mr. Frye further testified that the firm's work was done in an efficient manner and without a lot of "wheel-spinning." In conclusion, Mr. Frye stated that the work done by Mr. Woods and his law firm and the fees charged were both reasonable and necessary for this type of case. Mr. Frye estimated that 98% of Hartford counsel's time was spent defending Count II of First Bank's Complaint. Mr. Frye based his conclusion on the fact that Hartford offered to pay the Count I claim. From January 1, 2000 through March 31, 2000, additional fees were incurred in the amount of $12,559.67 by Hartford in filing its sanctions motion.[18] From April 1, 2000 through April 30, 2000, Hartford incurred $14,368.29 in attorney fees.

The Court accepts Mr. Frye's unrefuted expert testimony on the reasonableness of attorney fees paid by Hartford to the McNamara law firm. This Court further accepts Mr. Frye's unrefuted testimony that 98% of the total time was spent on Count II in Hartford's Motion for Summary Judgment, and in First Bank's appeal to the Sixth Circuit. Ninety-eight percent of attorney fees will be awarded for Hartford's work through First Bank's appeal to the Sixth Circuit, or $63,187.13.[19] This Court will award 100% of attorney fees to Hartford for the time it spent in filing its motion for sanctions, or $49,395.76, which includes $7,320.43 for the time Hartford spent in responding to First Bank's Post–Trial Brief, and an additional $1,148.00 for the time Hartford spent drafting a Memorandum Contra First Bank's Motion for Sanctions. In total, this Court awards $112,582.89 in attorney fees to Hartford.[20]

### IV. CONCLUSION

For the foregoing reasons, Hartford's Motion for Sanctions under this Court's inherent power is **GRANTED.** First Bank is hereby ordered to pay $112,582.89 in attorney fees to Defendant Hartford.

**IT IS SO ORDERED.**

---

17. Using the Altman and Weil, Inc.'s survey, Mr. Frye took into account that Mr. Woods had over twenty years of experience and worked in a large metropolitan area. For example, for a firm size of fewer than nine attorneys, median fees are $175 per hour and average fees are $183 per hour. For attorneys who work in cities with populations over one million, such as Columbus, Ohio, the average hourly rate is $241 per hour. For those admitted in 1973, the year Mr. Woods was admitted to the bar, the average rate is $220 per hour and the lower quartile rate is $180 per hour. Based on this information, Mr. Frye concluded that Mr. Woods's rate of $140 per hour was low.

18. Initially, Hartford agreed to pay McNamara and McNamara $5000 to bring the sanctions motion. Following the Sixth Circuit opinion, Hartford believed that it could settle the sanctions motion with First Bank. After Hartford realized that this would not be possible, it began to pay McNamara its regular hourly rate starting January 1, 2000.

19. Hartford's Legal Bills from March of 1995 to December of 1999 were $64,476.66, therefore ($64,476.66 × .98) = $63,187.13.

20. This number is arrived at by adding 98% of Hartford's legal bills through First Bank's appeal to the Sixth Circuit, $63,187.13, plus 100% of Hartford's legal bills for the time it spent in filing its Motion for Sanctions, $49,395.76, for a total of $112,582.89.